**MILLER'S BOTTLED GAS, INC.,**
**Plaintiff–Appellant,**

v.

**BORG–WARNER CORPORATION,**
**Defendant–Appellee.**

No. 90–5886.

United States Court of Appeals,
Sixth Circuit.

Argued April 4, 1991.

Decided Feb. 3, 1992.

Rehearing Denied March 3, 1992.

John R. Bush, argued, briefed, Bush, Ross, Gardner, Warren & Rudy, Tampa, Fla., Karl N. Crandall, Bowling Green, Ky., Frank Miller, Jr., Louisville, Ky., for plaintiff-appellant.

Philip I. Huddleston, Huddleston Bros., Bowling Green, Ky., Hugh N. Smith, briefed, David S. Nelson, argued, Smith & Fuller, Tampa, Fla., for defendant-appellee.

Before RYAN and SUHRHEINRICH, Circuit Judges; and ZATKOFF, District Judge.[*]

RYAN, Circuit Judge.

Plaintiff, Miller's Bottled Gas, Inc. (Miller's), purchased allegedly defective carburetors from defendant Borg–Warner Corporation. Miller's appeals both the district court's summary judgment for Borg–Warner rejecting Miller's negligence-based product-liability claim, and the court's directed verdict for Borg–Warner dismissing Miller's fraud and negligent misrepresentation claims.

With respect to the product-liability claim based upon alleged negligence, the issue before us is whether under Kentucky law Miller's may recover for purely economic

---

[*] The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

injury. We conclude that it may not do so. With respect to the fraud claim, the issue is whether Miller's produced more than a scintilla of clear and convincing evidence that Borg–Warner made false statements concerning the carburetors in order to induce Miller to rely upon the statements. We conclude that Miller produced the requisite evidence. With respect to the negligent misrepresentation claim, the issue is whether Miller provided more than a scintilla of evidence that Borg–Warner made false statements concerning the carburetors. We conclude that Miller produced the requisite evidence on this point as well.

Because the issues before us concern the sufficiency of the evidence, it is necessary that we burden the opinion with a rather extensive recitation of the facts.

## I.

### A.

In 1975, Roy Johnson, then a Borg–Warner employee, conceived an idea for a dual-fuel carburetor. He produced fourteen hand-built prototypes. According to Johnson, Borg–Warner mounted the prototypes on different vehicles throughout the country in order to gauge the carburetors' performance. Dynamometer tests rated engines equipped with these prototype carburetors high in terms of power and efficiency.

Borg–Warner attached one of the fourteen prototypes to both 460–cubic–inch and 350–cubic–inch engines, which traveled over a 135–to–150–mile stretch of roads featuring a variety of terrains and driving conditions. The corporation tested another prototype using a Chevrolet Suburban equipped with a 350–cubic–inch engine. Johnson testified that this second prototype experienced "almost any condition that you could find through the midwest or the eastern part of the United States." Overall, according to Johnson, all fourteen carburetors performed at least satisfactorily in field tests conducted all over the United States, including the Southwest. By Johnson's estimate, the carburetors were driven a total of "three quarters of a million miles" during this field testing.

Next, perhaps in 1978, Borg–Warner built experimental "production prototypes" or "under-development" units more or less based upon the fourteen prototypes. According to trial witnesses, abbreviated dynamometer tests indicated that the majority of these units "ran very well." Borg–Warner field-tested these prototypes by installing some of them in Borg–Warner officers' cars. According to former Borg–Warner employees, the corporation continued to test the new carburetor in the laboratory on an ongoing basis.

In late 1979 and early 1980, Borg–Warner manufactured a "pilot run" of the new carburetors. Johnson performed dynamometer tests on the pilot run carburetors, which came to be called "acucarbs," sixteen to twenty hours per day. A defense witness stated "[W]e kind of rushed [the pilot-run acucarbs] onto company cars.... We did this quickly because [the sales department wanted to] get it out there into the marketplace...." His memory refreshed by a written report, the witness testified that he believed that one of the pilot-run acucarbs "ran lean and had a huge backfire that caused damage to backfire vent doors and spring."

Borg–Warner Sales Manager Hollingsworth testified that in the last quarter of 1979, he "raised hell with people all the way from the vice president of engineering to the members of the [acucarb development] task force, because I didn't think that they were following Roy Johnson's unit which they kept telling me that they couldn't build in production, they had to make changes." Specifically, Hollingsworth complained:

> [T]he typical situation would be that the doors didn't rub on the nylon plate that was installed in the side of his unit and we had air gaps around [the] doors, both sides.... And they had [installed] a washer that you could adjust, but they were not rubbing.... [I]n production they couldn't build them that way and the engineers would have to allow 16th of an inch or whatever for clearance. And my problem naturally was that they won't work if they are drawing air in ..., if you can see daylight it's no good.

A defense witness confirmed that Hollingsworth registered such protests. According to that witness, "we [Borg–Warner employees] were all aware of the potential air leaks at two places. The sides of the doors and at the seal right at the shaft, and undoubtedly I discussed that [situation] with Mr. Hollingsworth and many others...." According to another witness, Hollingsworth stated that in approximately the last quarter of 1980 "the Acucarb was untried and uncalibrated as it was released to production, it was not tested and proven enough to be sold."

A former Borg–Warner senior project-engineer testified that any test data available as of the first two months of 1980 were "sporadic data that would have been the personal property of Roy Johnson or John Daum that showed single point testing...." According to the project-engineer, the exhausts gas analysis was very limited because Borg–Warner possessed "only two working engine dynamometers with limited exhausts gas analysis and limited capabilities to measure fuel flow air flow into the engine." The engineer testified that "the test specifications were very informal and certainly not regimented."

After the carburetor "went through various stages of design" as a result of testing at various stages, Borg–Warner prepared to build the first production units in January 1980. Hollingsworth testified as follows:

> There had been no testing of the units other than the units ... that were on engineering department vehicles, vice president of engineering, Roy Johnson's car, maybe John Daum's car, but *people in the engineering department was the only testing that had been done other than the original prototypes that Roy Johnson built.* At that point in time we were faced with we either going to have to go into full test program or we are going to have to start producing units.... [Dealers said that] this market is not going to last forever. *Under a normal program we would have tested units for anywhere from 90 to 120 days or longer, and they had, normally would have had to have been produc-*

*tion units.* And at the middle of January, early part of January there had been no production units built. So at that point are we going to run production units on test or are we going to build product and ship it to the customer.

(Emphasis added.) According to one witness, Borg–Warner tested the production units prior to sale by placing one on an employee's car before the employee went for a long drive. Borg–Warner apparently also continued to perform some type of laboratory tests on the acucarb after production and distribution began.

At some point after production began, Borg–Warner placed a gasket between covers of the carburetor to remedy problems caused by air leaks between the top cover and the body joint. Such leaks did not occur in the experimental models, possibly due to a design change that occurred between the experimental and the production designs. Early production units also developed problems with their doors, eventually necessitating the addition of a soft piece of Teflon cloth to the doors.

Several former Borg–Warner employees, including one defense witness, testified that the design of the production version of the new carburetor differed in several significant respects from the design of the fourteen handcrafted prototypes. The witnesses cited differences in fuel enrichment devices, door construction, door seal, backfire valves, calibrations, linkage, tolerance, weight, material, and top-cover thickness. According to one witness, dimensional changes occurred "as the result of rush production."

Several witnesses testified that the design changes impaired the acucarb's performance. Specifically, a former Borg–Warner employee testified that "[T]he linkage had a lot more friction and there were a lot of tolerance problems associated with the production unit that we did not have with the prototype." Another former employee testified that the "first production models didn't produce the same results in the area of power, acceleration [as the prototypes produced].... [T]he factory pro-

duction model didn't produce enough CO. You couldn't get enough fuel through it.... It ran too lean."

Moreover, one witness stated that due to the design of the acucarb, probably "fewer than twenty men" in the United States knew how to install the carburetor properly. In his view, due to faulty installation and possibly because of thinner material in the production-version cover-plate, the production units had a "problem of deformation of the top plate and the concomitant [problem] of ... associated bowing and allowance of air leaks." Another witness explained that air leaked because the top steel plate "was a small piece that was stamped out and would have some warps ... so there was no way to put a gasket under [there] and ... it would leak between the top cover and ... moving plate."

### B.

In December 1979, Hollingsworth contacted Glenn Miller of Future Fuels, Inc. (FFI), an alter ego of Miller's, in order to encourage FFI to become an acucarb distributor. Miller described Hollingsworth's sales presentation as follows:

> [Hollingsworth] stated that his reason for the call was to see if Miller's, through their Future Fuels Company, would be interested in again becoming a [Borg–Warner product distributor]. He informed us that [due to] the upturn of the LP gas and motor fuel market and the strong demand for carburetion equipment ... Marvel–Schebler/Tillotson had decided to manufacture their dual fuel conversion system, *this being the same carburetion system Mr. Roy Johnson had prototyped in the mid 1970's and that Miller's and Future Fuels did have some knowledge of, through seeing the prototype* run on one of the salesman cars who had worked for Century at the time, Mr. Dave Barnes. *Mr. Hollingsworth informed us that they had reworked the prototype mixer,* that it had been running on various vehicles at the present time, that it would fit any size U.S. made vehicle engine being manufactured at that time from a 200 cubic inch

displacement engine up through the 454 and 460 engines, which at the time were the largest production models being manufactured in the United States. He also stated that the power and fuel economy on the Acucarb as it had been made was superior to any other dual fuel carburetor system that had ever been on the market and that the production should be available in some 60 to 90 days....

(Emphasis added.) According to Miller, Hollingsworth identified the acucarb as "the old Roy Johnson prototype that we have had up there for years." Miller testified that he "relied upon what [Hollingsworth] said to me, *that was a Roy Johnson mixer, that it had been tested for three years* or more, that it had plenty of power. I say power, I am talking about horsepower...." (Emphasis added.)

Miller further testified that in deciding to become an acucarb distributor, he relied upon brochures distributed by Borg–Warner. One brochure introduced into evidence stated, "[T]his new system is designed, developed, *thoroughly tested* and produced by the recognized leader in LP-gas carburetion...." (Emphasis added.) Another brochure entered into evidence stated that Borg–Warner developed the carburetor after "three years of intensive research and testing, both in the lab and over the road" and that the carburetor was "the result of a comprehensive developing and testing program."

In late 1979 and early 1980, Miller's regularly subscribed to *LP Gas News* and *Butane Propane News*. The December 1979 issue of *LP Gas News* and the December 1979 and January 1980 issues of *Butane Propane News* contained identical full-page acucarb advertisements. The advertisements stated that the carburetor was "the result of over three years of intensive research and development—in the lab and in the field" and was *"thoroughly tested."* (Emphasis added.) Miller testified that he read the magazine advertisements and relied upon them in deciding to become an acucarb distributor.

Miller's, through FFI, formally agreed to become an acucarb distributor in January

1980. In late January 1980, Borg–Warner shipped FFI a free sample of the acucarb, which Miller's apparently found satisfactory. FFI began ordering acucarbs in February 1980, and received its first partial shipment on or near March 30, 1980. At trial Miller's introduced evidence allegedly showing that Miller's suffered damage, including loss of customers' goodwill, due to the acucarb's consistent malfunctioning.

### C.

Meanwhile, in 1980, many acucarb users were experiencing difficulties. One customer testified that the problems resulted from incorrect installation of the unit. However, a former Borg–Warner employee testified that in the spring of 1980 there were "a lot of production problems." He recalled that the manufacturing line was unable to correctly assemble and machine the carburetors. He also testified that customers often installed the carburetor incorrectly by tightening the top plate too tightly, thus distorting it. Faulty installation, according to this witness, reduced power due to air leaks, and could cause backfiring. Borg–Warner sent its distributors supplementary parts ("update kits") to pass along to the ultimate customers, and according to one witness, the kits eliminated some possibilities for faulty installation.

Another witness testified that he talked to a lot of unsatisfied customers and that some of the dissatisfaction was well-founded due to production problems. Hollingsworth testified as follows:

> [W]e had numerous air leaks which [were] creating problems in the field. It was my feeling that/ a good mechanic, and I am not meaning every mechanic, but the good mechanics in the field could take a unit after they got it from Borg–Warner, overhaul it and it would work.... But the *general unit that was shipped out of the factory was not working, too many air leaks* involved.... air leaks create backfires, reduction in economy, hard starting.... the equipment wasn't any good.

(Emphasis added.)

On July 29, 1981, the Borg–Warner Director of Carburetion Marketing wrote Hollingsworth that numerous acucarbs were failing to perform satisfactorily or failing to perform at all. The Director's letter stated that customers' complaints ended only when Borg–Warner replaced the acucarbs with other carburetors. According to the letter, "This has all resulted in many of our managers refusing to use Acucarb systems...."

By about August 1980, Borg–Warner had stopped manufacturing acucarbs and had introduced the "2610," which operated on the same concept as the acucarb but more closely resembled the original prototypes. Several former Borg–Warner employees testified that Borg–Warner altered the acucarb in several significant ways in order to produce the workable "2610." One witness described the modification as "throwing some parts away and adding new parts." According to this witness, "[Borg–Warner was] much more confident that the quality would be vastly improved...." The witness testified that Borg–Warner replaced the steel backfire doors with umbrellas and replaced the faulty door seal with a more reliable mechanism. Testimony also described modifications to the fuel enrichment valve, the Z link, par valve, as well as several other adjustments made in response to various problems, such as air leakage and inadequate fuel supply. In fact, the main part salvaged from the acucarb apparently was the aluminum cast body or shell.

According to Hollingsworth, Borg–Warner offered to exchange "2610" 's for the distributors' unsold stock of acucarbs. Distributors returned a large number of acucarbs and even "2610" 's to Borg–Warner for a refund. Hollingsworth testified that the "2610" program proved unsuccessful because "the customer[s] ... had a long memory ... [T]hey were dissatisfied with the units they had already tried and [rejected] anything that looked like or similar to an original Acucarb...." Eventually, Borg–Warner sold the rights to manufacture the product line that included the acucarb.

## D.

Miller's filed a complaint against Borg–Warner in federal district court with jurisdiction based upon diversity of citizenship. This appeal relates to Counts III, IV, and V.[1] In its Count V negligence claim, Miller's alleged that Borg–Warner breached its duty to adequately test the acucarb and thereby caused Miller's economic damage. The district court granted Borg–Warner's motion for summary judgment on this Count.

Count III sought damages for negligent misrepresentation, and Count IV sought damages for fraud. The district court held a jury trial to evaluate the counts not disposed of by summary judgment. After Miller's presented its case, the district court granted Borg–Warner's motion for directed verdict with respect to Count IV (fraud). The district court also denied Miller's cross-motion for a directed verdict on that count. At the close of all evidence, Borg–Warner renewed its motion for directed verdict with respect to Count III (negligent misrepresentation), and the district court granted the motion.

## II.

In this diversity action, we apply the substantive law of Kentucky. *Cf. Bailey v. V. & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985).

### A.

#### Negligence

■ Our standard of review in an appeal from summary judgment is *de novo. Klepper v. First American Bank*, 916 F.2d 337, 341 (6th Cir.1990). Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The movant meets its initial burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). At that point, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

■ The district court granted summary judgment for Borg–Warner with respect to Miller's negligence claim, on the ground that a party suffering only economic damage may not maintain a product liability action based upon negligence. Noting the absence of controlling Kentucky authority, the district court relied upon *East River Steamship Corp. v. Transamerica Delaval*, 476 U.S. 858, 876, 106 S.Ct. 2295, 2304, 90 L.Ed.2d 865 (1986), as persuasive precedent.

In that admiralty case, the Supreme Court held that a supplier of faulty turbines to ship charterers "owed no duty under a products-liability theory based on negligence to avoid causing purely economic loss.... Thus, whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss." *East River Steamship Corp. v. Transamerica Delaval*, 476 U.S. 858, 876, 106 S.Ct. 2295, 2304, 90 L.Ed.2d 865 (1986). In *East River* the faulty turbines caused no personal injury or external property damage, but instead "damaged" only themselves and thereby increased operating costs. *Id.* at 859, 106 S.Ct. at 2296.

---

**1.** The statute of limitations barred Miller's breach-of-contract and warranty claims.

The Court determined that a commercial product injuring itself and inflicting only economic injury is "not the kind of harm against which public policy requires manufacturers to protect, independent of any contractual obligation." *Id.* at 866, 106 S.Ct. at 2300. According to the Court, the minority view among state courts that recovery for negligence is available under such circumstances "fails to account for the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." *Id.* at 871, 106 S.Ct. at 2302. The Court explained the policy rationale for its conclusions:

> [W]hen a product injures itself, the commercial user stands to lose the value of the product, risks the displeasure of its customers who find that the product does not meet their needs, or, as in this case, experiences increased costs in performing a service. Losses like these can be insured.... Contract law, and the law of warranty in particular is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements.... Permitting recovery for all foreseeable claims for purely economic loss could make a manufacturer liable for vast sums. It would be difficult for a manufacturer to take into account the expectations of persons downstream who may encounter its product [or suffer losses resulting from other parties' contact with the product.]

*Id.* at 871–74, 106 S.Ct. at 2302–04.

We agree with the Court's suggestion that for every party suffering personal or property damages, there generally exist many more parties suffering some degree, however slight, of economic injury. The public subsidizes the judicial system and thus stands to lose a great deal if all such parties suffering only economic injury may maintain negligence actions against manufacturers and suppliers of defective products. While some might argue that a party should be answerable in tort whenever that party causes *any* type of injury through its own negligence, reasons of judicial prac-

ticality foreclose such indeterminate liability.

Accordingly, consistent with our unpublished per curiam opinion in *Scott v. Stran Buildings*, 923 F.2d 855 (6th Cir.1991), we predict that the Kentucky Supreme Court would not allow recovery for purely economic losses in a product liability action based upon negligence.

## B.
### Fraud

■ When evaluating the propriety of a directed verdict in a diversity case, we apply the standard of the state whose substantive law governs the action. *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341, 1347 (6th Cir.1988). The Court of Appeals of Kentucky has summarized the standard governing directed verdicts:

> The only question to be determined by the court on a motion for directed verdict is whether the plaintiff has sustained the burden of proof by "more than a scintilla of evidence," that is, has the plaintiff submitted "evidence of probative value having fitness to induce conviction in the minds of reasonable men?" In so ruling, "The court must draw all fair and rational inferences from the evidence in favor of the party opposing the motion, and a verdict should not be directed unless the evidence is insufficient to sustain the verdict. The evidence of such party's witnesses must be accepted as true." It is well settled that circumstantial evidence "will authorize a submission of the contested issue to the jury," and is capable of sustaining its verdict. Further, it is not necessary that direct evidence of fraud be adduced" as "fraud may be established by evidence which is wholly circumstantial."

*Grant v. Wrona*, 662 S.W.2d 227, 229 (Ky. Ct.App.1983) (citations omitted).

■ Where the law requires clear and convincing evidence, we must determine whether the evidence is fit to induce conviction in the minds of reasonable persons under this elevated, relatively stringent evidentiary standard. *Cf. Klepper v. First*

*American Bank,* 916 F.2d 337, 342 (6th Cir.1990); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–53, 106 S.Ct. 2505, 2512–13, 91 L.Ed.2d 202 (1986); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 944 (6th Cir.1990).

■■■ The party asserting fraud bears the burden of establishing the elements of the tort by clear and convincing evidence. *Wahba v. Don Corlett Motors, Inc.,* 573 S.W.2d 357, 359 (Ky.Ct.App.1978). These elements are "(a) a material representation, (b) which is false, (c) known to be false or made recklessly, (d) made with inducement to be acted upon, (e) acted in reliance thereon, and (f) causing injury." *Wahba,* 573 S.W.2d at 359. Thus, "[a]ctionable misrepresentation [fraud] must relate to a past or present material fact which is likely to affect the conduct of a reasonable man and be an inducement of the contract. A mere statement of opinion or prediction may not be the basis of an action." *McHargue v. Fayette Coal & Feed Co.,* 283 S.W.2d 170, 172 (Ky.Ct.App.1955). Mere "sales talk" and "puffing" do not rise to the level of fraud, and most courts construe statements to be mere "puffing" where both parties have equal access to information. *McHargue v. Fayette Coal & Feed Co.,* 283 S.W.2d 170, 172 (Ky.Ct.App.1955).

■■■ The district court concluded that Miller's produced no evidence that statements made by Borg–Warner and its agents were either false or "made recklessly thereby inducing action on the part of the plaintiff." We disagree.

First, former Borg–Warner employees testified that Borg–Warner tested the production version of the acucarb only spottily and hastily in view of the need to market it before gasoline prices fell. These witnesses also testified that the production version differed significantly from the fourteen prototypes which Borg–Warner had tested thoroughly. Hollingsworth testified that in approximately the last quarter of 1980, the acucarb was "untried ... uncalibrated ... not tested and proven enough to be sold." Therefore, in our view, Miller's produced clear and convincing evidence from which the jury might have inferred that Borg–Warner did not thoroughly test the relevant version of the acucarb.

Second, Hollingsworth, shortly after making the above-quoted statement, solicited Miller's subsidiary to become an acucarb distributor, and according to Glenn Miller's testimony, stated that Borg–Warner had tested the acucarb thoroughly. Miller also testified that Hollingsworth equated the production version with the original prototype. At about the same time, Borg–Warner brought to Miller's attention the above-described brochures and advertisements stating that the acucarb had been tested thoroughly. Therefore, we believe that Miller's produced clear and convincing evidence from which the jury might have inferred that Borg–Warner made its statements with knowledge of, or at least reckless disregard for, their falsity.

Third, Miller's decided to distribute acucarbs only after Borg–Warner, through its agents and advertisements, stated to Miller's that Borg–Warner had tested the acucarb thoroughly. In our view, this situation presents more than a scintilla of clear and convincing evidence from which the jury might have inferred that Borg–Warner's assertions induced Miller's action.

Accordingly, we hold that the district court erred in directing a verdict for Borg–Warner on the fraud claim.

### C.

### Negligent Misrepresentation

Although Judges Suhrheinrich and Zatkoff do not agree, I am of the view that the district court erred in granting a directed verdict for Borg–Warner on the negligent misrepresentation issue. Therefore, Judge Suhrheinrich has written separately, for the majority, holding that Kentucky would not recognize the tort of negligent misrepresentation in this case. What follows, therefore, in this sub-part (C), is my dissenting view in the matter.

Section 552(1) of the Restatement (Second) of Torts remains the single most widely accepted statement of the conditions under which a party incurs liability for the tort of negligent misrepresentation:

One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Thus, unlike fraudulent misrepresentation, negligent misrepresentation does not require scienter as an element of the tort. More specifically, while fraudulent misrepresentation requires that the defendant "have intentionally made a misrepresentation ..., or made the representation with a reckless disregard for the truth," negligent misrepresentation requires only that the defendant "have made the representation in good faith but negligently." Kentucky Jurisprudence § 10-5 (Lawyers' Cooperative 1987).

Of course, "[w]hen there is no intent to deceive but only good faith coupled with negligence, the [defendant's] fault ... is sufficiently less to justify a narrower responsibility for [the misrepresentation's] consequences." Restatement (Second) of Torts § 552 comment a (1977). Consequently, the Second Restatement generally limits liability for negligent misrepresentation to losses suffered

    (a) by the person or one of a limited group of persons for whose benefit and guidance he [the person making the misrepresentations] intends to supply the information or knows that the recipient intends to supply it; and

    (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552(2) (1977). We note that this section restricts the class of potential plaintiffs to a specified subset of parties whose injuries were foreseeable consequences of the defendant's negligent misrepresentations.[2]

While no Kentucky court has either acknowledged or denied the existence of a tort of negligent representation, we believe that if faced with the question, Kentucky "would adopt the standards set out in Restatement (Second) Torts, Section 552...." *Ingram Industries, Inc. v. Nowicki*, 527 F.Supp. 683, 684 (E.D.Ky.1981) (citing *American States Ins. Co. v. Morris*, Civ. Action No. 2372 (E.D.Ky. May 31, 1978)).[3]

The district court granted Borg–Warner's motion for directed verdict with respect to the negligent misrepresentation claim solely on the basis that there was "no falsity." The district court placed great emphasis upon the testimony of a defense witness who had served as engineering vice-president for Borg–Warner. The court stated, "[This witness] explained exactly what took place, he was in charge. Doesn't the man who has the superiors of power being in charge represent the corporation?" The district court reasoned as follows:

    Now, I heard [him] say ... that far more than three years if you took the time they did in the shop, the magnetomers, what they did to the unit. Whatever the machine is called, that all four pieces of equipment are covered by the same patent, that's all that is important. That to me is a theory, the theory is a dual fuel mixer, no one has legally shown me that I am incorrect, not a thing in the record to contradict that.

---

**2.** Some courts impose liability upon a seller for negligent misrepresentation only if there existed a "closer degree of trust and reliance than that of the ordinary buyer and seller." *Coolite Corp. v. American Cyanamid Co.*, 384 N.Y.S.2d 808, 811, 52 A.D.2d 486, 488 (1976). The existence of such a special relationship generally is a question of fact for the jury. *AFA Protective Systems, Inc. v. American Telephone & Telegraph Co., Inc.*, 456 N.Y.S.2d 757, 442 N.E.2d 1268, 57 N.Y.S.2d 912 (1982). Miller's might have been

able to convince the jury that a special relationship existed here in view of Miller's creation of an alter ego corporation solely for the purpose of marketing Borg–Warner's products. *See Coolite Corp.*, 384 N.Y.S.2d at 811, 52 A.D.2d at 488–89.

**3.** Due to a caption misprint in the Federal Supplement volume, the name of the plaintiff in this case is unavailable.

The district court also concluded, "[E]very-one here admitted they [Borg–Warner] did [test the product]."

As noted in the preceding section, more than a scintilla of evidence [4] indicates that later versions of the acucarb differed significantly from the fourteen original prototypes, and that Borg–Warner did not thoroughly test the final production version. Miller's also produced some evidence tending to establish the other elements of negligent misrepresentation. Allegedly, aware that the corporation had not thoroughly tested the acucarb, Borg–Warner supplied the false information in the course of its business in order to guide Miller's and other potential acucarb distributors in their own business transactions. A reasonable jury might find that Miller's justifiably relied upon Borg–Warner's statements.

Accordingly, I would hold that the district court erred in directing a verdict for Borg–Warner on the negligent misrepresentation claim.

### III.

For the foregoing reasons, the district court's summary judgment for Borg–Warner with respect to the negligence-based product liability claim is AFFIRMED, and the directed verdict for Borg–Warner on the fraud claim is REVERSED.

For the reasons stated in Judge Suhrheinrich's separate opinion, in which Judge Zatkoff concurs, the directed verdict

for Borg–Warner on the negligent misrepresentation claim is AFFIRMED. The case is REMANDED to the district court for further proceedings.

SUHRHEINRICH, Circuit Judge (majority opinion; Part II–C).

The district court summarily denied Borg–Warner's motion for summary judgment as to Count III of Miller's complaint, negligent misrepresentation. It later granted Borg–Warner's motion for directed verdict as to the claim at the close of all the evidence. Unlike the fraud claim, however, the Kentucky courts have not considered whether Kentucky law recognizes a tort of negligent misrepresentation [1] in a commercial setting. The only related authority is *Ingram Industries, Inc. v. Nowicki,* 527 F.Supp. 683, 684 (E.D.Ky.1981) (citing *American States Ins. Co. v. Morris,* Civ. Action No. 2372 (E.D.Ky. May 31, 1978)) (district court sitting in diversity held that sections of Restatement (Second) of Torts governing liability for negligent misrepresentation controlled action brought under Kentucky law regarding scope of an accountant's liability for negligence causing loss to a third party). We must therefore predict how the Kentucky courts would deal with this issue. Based on our conclusion that Kentucky would preclude Miller's product-liability claim for negligence resulting in purely economic injury, we likewise conclude that it would not allow recovery under a theory of negligent misrepresentation.

---

**4.** I would not decide whether Kentucky courts would require clear and convincing evidence as the standard of proof in negligent misrepresentation cases or would require instead only proof by a preponderance of the evidence. In my view, more than a scintilla of clear and convincing evidence supported Miller's contentions concerning the evolution and testing of the acucarb-related line of carburetors.

**1.** Section 552 of the Restatement (Second) of Torts, "Information Negligently Supplied for the Guidance of Others," provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable

care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered.

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Count III of Miller's complaint alleges that Borg–Warner "misrepresented several facts regarding the Acucarb to Future Fuels and Miller's regarding the quality, nature, and appropriate uses of the product," and further that Borg–Warner knew or should have known

> that the propane manufacturing and distribution system is such that distributors and dealers such as Future Fuels and Miller's must rely upon the quality and performance of products manufactured by the defendant and that in the event that distributors and dealers lose the good will of their customers, the result will or would be economically catastrophic in that they would be unable to maintain its customers who would transfer their business to competitors....

Although dressed in a different costume, the essence of Miller's claim is that its losses occurred as a result of the Acucarb's defects and failure to perform as expected. "But the injury suffered—the failure of the product to function properly—is the essence of a warranty action, through which a contracting party can seek to recoup the benefit of its bargain." *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868, 106 S.Ct. 2295, 2300, 90 L.Ed.2d 865 (1986). Thus, the Supreme Court's reasoning in *East River* precluding negligence-based actions for purely economic losses, which we have expressly adopted in section II. A., applies with equal force to the tort of negligent misrepresentation in a commercial context.

The dissent suggests that the Kentucky courts would allow negligent misrepresentation claims since the tort, by its terms, "restricts the class of potential plaintiffs to a specified subset of parties whose injuries were foreseeable consequences of the defendant's negligent misrepresentations." While this was certainly one concern of the *East River* court, *see* 476 U.S. at 874, 106 S.Ct. at 2303, it is clear from a reading of that decision that the central concern of the Supreme Court was "the need to keep products liability and contract law in separate spheres and to maintain a realistic limitation on damages." Allowing a tort of negligent misrepresentation in a commercial setting would not serve the public policy judgment underlying products liability law—that of providing more protection for consumers from dangerous products than is afforded by warranty law—and it would undermine the policy rationale set out in *East River.* For these reasons then, we hold that Borg–Warner's complaint failed to state a claim for negligent misrepresentation under Kentucky law. We therefore affirm the district court's grant of a directed verdict as to Count III.