70 F.3d 1272
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sandra K. JOHNSON, Plaintiff-Appellant, Cross-Appellee,
v.
PHILIP MORRIS, INC., Defendant-Appellee, Cross-Appellant.
 Nos. 94-5972, 94-5928.
 United States Court of Appeals, Sixth Circuit.
 Nov. 29, 1995.
 
 Before: MILBURN and NELSON, Circuit Judges; and MORTON,[1] District Judge.
 PER CURIAM.
 
 
 1
 This is a diversity action in which Sandra K. Johnson alleged that her employer, Philip Morris, Incorporated ("Philip Morris"), discriminated against her with respect to the terms, conditions and privileges of her employment because of her sex. Her claim arose under Kentucky's civil rights statute, specifically Kentucky Revised Statutes Annotated Sec. 344.040 (Baldwin 1986). After a two-day trial, the jury returned a verdict for the defendant. On appeal, the issues are: (1) whether the trial court erred in several of its evidentiary rulings; (2) whether the trial court's comments on the evidence misled or prejudiced the jury; (3) whether the trial court erred in refusing to incorporate Johnson's proposed jury instructions in its final charge; and (4) whether the accumulation of these errors warrants reversal.
 
 
 2
 Philip Morris cross-appealed the district corut's denial of its motion for judgment as a matter of law it made at the end of the plaintiff-appellant's proof and again at the end of all the proof. For the reasons that follow, we affirm the district court.
 
 I.
 A.
 
 3
 Johnson began working for Philip Morris on August 13, 1985, and continues to work there today. Throughout her tenure with the company, she has held several different positions. She was hired in 1985 as a first-line supervisor in Philip Morris's stemmery plant in Louisville, Kentucky. At the stemmery plant, raw tobacco is unloaded and "conditioned" by adding moisture to make it more pliable. The stemmery was a seasonal operation. The plant closed in March and reopened in August each year. When the stemmery closed for the season in 1986 and 1987, Johnson was assigned to one of Philip Morris's other Louisville operations until the next season. The stemmery plant permanently closed in March of 1988. Thereafter, Johnson became a supervisor of the elevator operators on the 6th floor of one of the company's factory buildings. There, she transferred plugs of tobacco from various floors of the building to the cigarette floor, where cigarettes were put together.
 
 
 4
 In April 1989, Johnson was transferred from the 6th floor to a job as staging supervisor. She was replaced by a male. Johnson testified that she was moved from the 6th floor supervisor's job to another supervisor's job after two male employees got into a physical altercation. The management assured the union that Philip Morris would take "disciplinary action, and change things." Marvin Bostock, Johnson's supervisor, told Johnson that she was being transferred in order to cross-train in other areas of the department, which would make her job more secure. Indeed, Bostock testified that some Philip Morris employees were able to avoid being laid off in times of cutbacks in the work force because they were cross-trained. Johnson's transfer from the 6th floor did not result in a loss of income, benefits or status.
 
 
 5
 Later in 1989, Johnson became a third-shift supervisor in the flavor room. Johnson complained about the move to Mr. Bostock, because she had "never worked on third shift." In addition to her responsibilities in the flavor room, Philip Morris assigned Johnson "staging" duties. Staging is the process of assigning surplus hourly employees to fill in for employees who are absent. Staging duties took approximately one hour at the beginning of the third shift. Johnson testified that no other flavor room supervisor had ever been assigned staging responsibilities.
 
 
 6
 Edwin Turner, the manager of the primary department, testified that Ms. Johnson was the first third-shift supervisor in the flavor room. Initially, there was no need for a supervisor in that area of the department because the third-shift employees were primarily a clean-up crew. As the production line ran later into the third shift, management decided to add a supervisor and additional hourly employees. When Johnson complained about the staging duties on top of her supervisor duties, Philip Morris held the second shift supervisor over until the initial staging assignments were complete. After Ms. Johnson was transferred out of the flavor room, staging duties continued to fall on the third-shift flavor room supervisor for approximately three more years. There was no evidence that Johnson's transfer to the flavor room resulted in decreased income, benefits or status.
 
 
 7
 While Ms. Johnson was third-shift supervisor in the flavor room, a mistake originated in the flavor room and caused the contamination of 28,000 pounds of tobacco.
 
 
 8
 In February 1991, Johnson was transferred to a second-shift position on floor 4-6, where she was in charge of cutting and drying tobacco. Johnson preferred second shift. Johnson testified that she was the only supervisor on that floor, but the floor previously had two supervisors. Mr. Turner and Mr. Bostock testified that while there had been two supervisors on floor 4-6 at one point, the number of supervisors had been reduced to one several months before Johnson was placed in that position.
 
 
 9
 Later that month, she was transferred from floor 4-6 to floor 2-6. There was no decrease in pay, benefits or status.
 
 
 10
 In September 1991, Johnson was transferred to the third-shift conditioning room at the main plant, where she was responsible for steaming raw tobacco to increase its pliability. Ms. Johnson complained about being assigned to the conditioning room because less senior supervisors were available to be assigned to it. She also complained that once she became the conditioning room supervisor, she was told to strictly enforce the break time limits on the hourly employees. Johnson testified that under the previous supervisor, breaks could last "as long as they wanted as long as their job was done." (R. 55). Johnson testified that this created friction between her and the hourly employees.
 
 
 11
 After approximately one year, in 1992, Mr. Turner told Johnson that her supervisory position in the primary department was being eliminated. Due to a company-wide reduction in force, Mr. Turner had to eliminate two supervisors from his department. Johnson could either transfer to the quality assurance department or leave the company with a severance package. Johnson chose to become a quality assurance inspector. For the first year in this position, although she was in a lower grade position, Johnson continued at her same rate of pay.
 
 
 12
 Finally, in late 1993, Johnson was transferred back to third-shift conditioning, where she still works. With this move, she was upgraded back to the level of supervisor. After four or five months in the conditioning department, Johnson received a negative performance appraisal.
 
 
 13
 At the trial of this case, Johnson complained of ten adverse employment actions:
 
 
 14
 (1) her transfer from the 6th floor in April 1989;
 
 
 15
 (2) her transfer to the third-shift position in the flavor room;
 
 
 16
 (3) her extra "staging" duties while in the flavor room;
 
 
 17
 (4) her transfer from the flavor room in 1991 to a second-shift supervisor position on floor 4-6;
 
 
 18
 (5) her responsibilities on floor 4-6;
 
 
 19
 (6) her transfer from floor 4-6 to floor 2-6;
 
 
 20
 (7) her transfer from floor 2-6 to the third-shift conditioning supervisor position;
 
 
 21
 (8) her responsibility for enforcing time limits for rest periods on the hourly employees;
 
 
 22
 (9) her demotion from supervisor to quality assurance inspector; and
 
 
 23
 (10) her negative performance evaluation.
 
 B.
 
 24
 Johnson filed this action in August of 1992, alleging that Philip Morris had discriminated against her on the basis of age and sex, in violation of the Kentucky Civil Rights Act, K.S.A. Sec. 344.040. Philip Morris removed the case to the United States District Court for the Western District of Kentucky on the basis of diversity jurisdiction. Prior to trial, Philip Morris moved for partial summary judgment on Johnson's claims of age discrimination and "hostile environment" discrimination. This motion was granted and is not a subject of this appeal.
 
 
 25
 Johnson presented her disparate treatment claim to a jury on June 21-22, 1994. Philip Morris moved for judgment as a matter of law at the end of Johnson's proof and again after all the proof. The trial judge reserved ruling on the first motion and denied the second. On June 22, 1994, the jury returned a verdict for Philip Morris. Johnson filed a timely notice of appeal on July 18, 1994. Philip Morris filed its notice of cross-appeal on July 25, 1994.
 
 II.
 A.
 
 26
 Johnson's first assignment of error involves the district court's evidentiary rulings. We review admission and exclusion of testimony by the trial court under the abuse of discretion standard. Mitroff v. Xomox Corp, 797 F.2d 271, 275 (6th Cir.1986).
 
 
 27
 Johnson first alleges that the trial court improperly refused to allow her to examine Terri Phillips, a former Philip Morris employee, about Marvin Bostock's derogatory comments of women in the workplace. Exclusion of this testimony was not erroneous because it was cumulative and of little relevance. First, Johnson's counsel was allowed to question Johnson about Mr. Bostock's comments, so additional questions of another witness would have been cumulative. Second, Johnson's claim at trial was one for disparate treatment only, and did not include a claim for hostile work environment. Therefore, the trial court's exclusion of this testimony was not an abuse of discretion.
 
 
 28
 Johnson next alleges that the trial court improperly refused to permit her to testify about the sexist attitudes of Stu Burns, the first-shift flavor room supervisor. In an offer of proof, Johnson testified that Burns frequently stated that he did not want women in the flavor room and boasted about his influence with upper management to keep women out of the flavor room. She also asserts that the district court wrongfully excluded her testimony about (1) the reasons she felt the move out of the flavor room was discriminatory, and (2) her complaint about Stu Burns' behavior to Dan Lynch, the Louisville plant manager, who took no action.
 
 
 29
 The trial court did not err in restricting Johnson's testimony about Stu Burns. There was no proof that Stu Burns was anything but a co-worker, and he had no supervisory authority over Johnson. Further, the proof revealed that Johnson got the supervisor position in the flavor room. Finally, because Johnson's hostile environment claim was dismissed on summary judgment, this evidence was of little import.
 
 
 30
 Third, Johnson alleges that the trial court improperly refused to let her counsel ask Ed Turner about what system, if any, Philip Morris had in place to ensure that the work assignment of supervisors was undertaken in a non-discriminatory fashion. The district court also refused to allow Johnson to ask Mr. Jim Payne, Philip Morris's Director of Human Resources, the number of female first-line supervisors at the Louisville plant. This evidence would only be relevant in a claim for disparate impact, and not in a claim for disparate treatment, so exclusion of such numbers was not an abuse of the trial court's discretion.
 
 
 31
 Accordingly, Johnson's first assignment of error has no merit.
 
 B.
 
 32
 Johnson next alleges that the judge made several improper comments in front of the jury, amounting to reversible error. Johnson's counsel failed to object to the trial court's comments. However, such failure to object does not preclude this court from considering the issue on appeal. United States v. Hickman, 592 F.2d 931, 936 (6th Cir.1979).
 
 
 33
 It is the trial judge's duty to ensure that the issues are not obscured. United States v. Carabbia, 381 F.2d 133, 139 (6th Cir.1967), citing Knapp v. Kinsey, 232 F.2d 458, 466 (6th Cir.1956), cert. denied, 252 U.S. 892 (1956). The comments of a trial judge will not amount to denial of a fair trial absent a showing that the court's comments prejudiced or misled the jury. Quercia v. United States, 289 U.S. 466, 469 (1933).
 
 
 34
 Johnson points to three specific instances where the court made comments she thought were improper. First, the trial judge interrupted her counsel's opening statement to caution the jury that the fact that Johnson was replaced in one position by a "less senior male" was irrelevant.[2]
 
 
 35
 The second interjection Johnson opposes occurred during Johnson's direct testimony. She testified that as a supervisor on floor 4-6, Philip Morris assigned her a work load that was previously shared by two male supervisors:
 
 
 36
 JOHNSON: I was the only supervisor on that floor and previously there had always been two supervisors to run that floor.
 
 
 37
 Mr. KIMBALL: What kind of difficulties did that cause?
 
 
 38
 JOHNSON: Well, it was a huge floor, I was running all the time. I was in training, I only had 27 days of training from Bob Jury, which had been on that floor for a number of years. They took him off that floor while I was still in training and put him on another floor when they knew he was retiring.
 
 
 39
 COURT: All right. That doesn't have anything to do with this case. Next subject, please.
 
 
 40
 MR. KIMBALL: Well, I think it does your honor. She had a job to do that--
 
 
 41
 COURT: Go ahead sir, I ruled.
 
 
 42
 (R. 41)
 
 
 43
 Finally, Johnson argues that the trial court improperly commented on the evidence to the jury during Johnson's direct testimony about her supervisor's attitude about women:
 
 
 44
 COURT: ... So I will let the witness answer this question for the limited purposes of seeing, of seeing whether or not, let us determine at a later time whether relevant to this case.
 
 
 45
 Answer your question.
 
 
 46
 Philip Morris can do, as far as this case is concerned, take any action for any legitimate reason they wanted to and they took that action, it's not actionable here. The only thing they couldn't do, they could not, under the law,--just one minute--it would be unlawful for them to discriminate against her with respect to compensation, terms of employment or conditions or privileges because of her sex. Anything else they did or what other people thought about gender, things like that, is irrelevant.
 
 
 47
 Go ahead.
 
 
 48
 Mr. KIMBALL: Thank you your honor. My question is what if anything did your supervisor, Marvin Bostock, ever state to you about opinions of women in the workforce?
 
 
 49
 JOHNSON: Made lots of comments about women, several of them. And one of them was women weren't competent enough to run the process and the other one was that women shouldn't be in the workplace, that they should be home in the kitchen taking care of babies.
 
 
 50
 (R. 47-48).
 
 
 51
 Upon review of the record, it is apparent that the trial judge's comments and demeanor did not deny Johnson a fair trial. His comments were attempts to ensure that the issues were not obscured, to ensure that testimony was not misunderstood, and to move the case along. There is no evidence of bias, nor is there any showing that the trial judge's interruptions were extensive or overbearing. Johnson's second assignment of error is without merit.
 
 C.
 
 52
 Johnson's third assignment of error arises out of the jury instructions given by the district court in this case. Johnson alleges that the district court erred in rejecting her proposed jury instructions regarding the issue of gender discrimination and instead instructing the jury using the three-stage McDonnell Douglas formula.[3] McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973).
 
 
 53
 Johnson's theory at trial included proof that she was subjected to discriminatory acts that did not fit neatly into the McDonnell Douglas framework. For example, she alleged that she was assigned more work than her male counterparts.[4] Johnson further alleges that she was moved frequently from to job to job, she was required to enforce the break rules upon the hourly workers while she was third-shift conditioning supervisor, and she received a negative performance evaluation. Johnson argued that these employment decisions were substantially motivated by her sex. Because Johnson could not show in each of these instances that she was demoted and replaced by someone outside the protected class, as required by the first stage of proof in McDonnell Douglas, she objected to the typical McDonnell Douglas instruction and proposed jury instructions that were tailored to fit the facts of her case.
 
 
 54
 Johnson's proposed jury instructions told the jury to find for Johnson if it was satisfied that (1) Philip Morris discriminated against Johnson in the compensation, terms, privileges, or conditions of her employment, and (2) Johnson's sex was a substantial factor in bringing about the discrimination. Johnson's proposed instructions went on to define "discrimination" as "any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person." (R. 16). K.R.S. Sec. 344.010(5). Johnson argues that the trial court erred when it (1) failed to instruct the jury on the meaning of "discrimination" as defined in the Kentucky civil rights statute, and (2) declined to incorporate Johnson's proposed instructions on the ultimate issue of gender discrimination.
 
 
 55
 Johnson is not entitled to a new trial due to deficient jury instructions unless the "instructions, taken as a whole, are misleading or give an inadequate understanding of the law." Bowman v. Kock Transfer Co., 862 F.2d 1257, 1263 (6th Cir.1988).
 
 
 56
 Kentucky courts have followed federal law in interpreting its civil rights statute, because its provisions parallel the provisions of Title VII. Gafford v. General Elec. Co., 997 F.2d 150, 166-67 (6th Cir.1993). See Kentucky Comm'n on Human Rights v. Kentucky, 586 S.W.2d 270, 271 (Ky.Ct.App.1979). In this case, the district court instructed the jury that, in order to prevail on her sex discrimination claim, a plaintiff must first establish a prima facie case. If a prima facie case has been made, the employer must then articulate a legitimate explanation for its actions. If that happens, the plaintiff must then show that the articulated reason was a mere pretext for discrimination. This order of proof comports with federal law. Gafford v. General Elec. Co., 997 F.2d 150 (6th Cir.1993) (citations omitted). The trial court's instruction of the three-stage McDonnell Douglas formula was not erroneous.
 
 
 57
 We further find Johnson's argument to be undercut by the fact that the jury found that Johnson had proven a prima facie case under the four prongs of the McDonnell Douglas formula. Accordingly, Johnson's third assignment of error has no merit.
 
 D.
 
 58
 Finally, Johnson argues that the cumulative effect of these errors was to deprive her of a fair trial. This assertion is without merit. As stated above, we do not find that the rulings were made in error. Even if the rulings were erroneous, their cumulative effect would be slight.
 
 III.
 
 59
 As cross-appellant, Philip Morris appeals from the trial court's denial of its motion for judgment as a matter of law.
 
 
 60
 This court's standard of review of motions for a directed verdict is identical to the standard used by the district court. See Hurt v. Coyne Cylinder Co., 956 F.2d 1319, 1328 (6th Cir.1992). In diversity cases, this circuit adheres to the minority rule that state law governs the standard for granting a motion for directed verdict. J.C. Wyckoff & Associates v. Standard Fire Ins. Co., 936 F.2d 1474, 1482 (6th Cir.1991); see also Miller's Bottled Gas, Inc. v. Borg-Warner Corp., 955 F.2d 1043, 1050 (6th Cir.1992). In Borg-Warner, we recognized Kentucky's standard governing directed verdicts:
 
 
 61
 The only question to be determined by the court on a motion for directed verdict is whether the plaintiff has sustained the burden of proof by "more than a scintilla of evidence," that is, has the plaintiff submitted "evidence of probative value having fitness to induce conviction in the minds of reasonable men?" In so ruling, "The court must draw all fair and rational inferences from the evidence in favor of the party opposing the motion, and a verdict should not be directed unless the evidence is insufficient to sustain the verdict. The evidence of such party's witnesses must be accepted as true."
 
 
 62
 955 F.2d at 1050 (quoting Grant v. Wrona, 662 S.W.2d 227, 229 (Ky.Ct.App.1983) (citations omitted)).
 
 
 63
 Given this standard of review, and upon review of the record, we agree with the district court that Johnson's claim of discrimination was properly submitted to the jury. The district court's denial of Philip Morris's motion for judgment as a matter of law was not error.
 
 IV.
 
 64
 For the reasons stated, the district court is AFFIRMED.
 
 
 
 [1]
 Honorable L. Clure Morton, United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [2]
 The colloquy was as follows:
 MR. KIMBALL: ... Now the first job she got in the primary department she had for about two years and she pretty well liked that job and didn't have any real problems there. But then she was transferred out of that job and replaced with a less senior male for reasons that--
 THE COURT: I'll--
 MR. KIMBALL: Excuse me?
 THE COURT: I'll caution you the fact she was transferred out of the job and replaced by a less senior male has nothing at all to do with this case. (R. 3)
 
 
 [3]
 The trial court instructed the jury in part, and the jury answered, as follows:
 INSTRUCTION NO. 2
 To establish her claim Sandra Johnson must first introduce proof that Philip Morris intentionally discriminated against her because of her gender. To meet this standard she must have proved the following four elements by a preponderance of the evidence:
 (1) That she is a female;
 (2) That Philip Morris took job action which adversely effected [sic] her employment situation;
 (3) That the job action was taken despite her qualifications for a job from which she was removed; and
 (4) That the job from which she was removed was filled by a male.
 QUESTION NO. 1: Do you believe from the evidence that the plaintiff, Sandra Johnson, has proved each of the foregoing elements? X YES __NO
 INSTRUCTION NO. 3
 If you answered "YES" to the question contained in Instruction No. 2, then you must consider Philip Morris' defense that the action was based on good cause or other reasonable factors other than gender. As you consider this, remember that Philip Morris hears only the burden of articulating a legitimate non-discriminatory reason for the action. Philip Morris does not have to persuade you of this by a preponderance of the evidence; rather it need only produce enough evidence in support of its claim to create genuine issue of fact in your mind.
 QUESTION NO. 2: Do you believe from the evidence that Philip Morris articulated a legitimate non-discriminatory reason for its actions? X YES __NO
 INSTRUCTION NO. 4
 Once Philip Morris has stated a legitimate business, non-discriminatory reason for its actions regarding Sandra Johnson, Sandra Johnson must persuade you, by a preponderance of the evidence, that the reasons articulated by Philip Morris are but a mere pretext or cover-up for what in truth was a discriminatory purpose, in that but for her gender each job action in question would not have occurred.
 QUESTION NO. 3: Do you believe from the evidence that the job actions taken by Philip Morris was in truth a pretext or cover up for a gender discriminatory reason? __ YES X NO.
 
 
 [4]
 Specifically, Johnson alleges that Philip Morris made her solely responsible for floor 4-6, a floor which previously enjoyed the help of two supervisors. Philip Morris also assigned Johnson the staging duties when she was supervisor of the flavor room