property as it was fraudulently represented and the actual value of the property. *Dempsey v. Marshall*, 344 S.W.2d 606, 607 (Ky. 1961). But I do not join in the majority's confusion about what the damages thus calculated are to recompense. These damages are for fraudulent inducement. Because the Sallees elected to affirm the contract they were fraudulently induced to enter into, they are limited to damages measured by the difference between the actual and the misrepresented value.

Finally, I agree with the majority's determination that the bankruptcy court erred in awarding damages for the loss of the ESOP (although in light of the discussion of the Sallees' own culpability in destroying the tax-deferred status of their ESOP and the ultimate holding that the bankruptcy court erred in awarding damages for loss of the Lowe's stock, I am puzzled by the majority opinion's statement that the bankruptcy court's finding that the Sallees used ordinary care in relying on the Bank's representations regarding that stock is supported by the record). I agree as well that the Sallees could have elected to rescind that transaction—which was part of the larger laundromat transaction—but did not. That they thereby limited themselves to damages measured by the difference between the actual value of the laundromat and its misrepresented value, however, is not because they are not entitled to damages for fraudulent inducement. It is because in this action for fraudulent inducement, they elected to affirm the contract.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0128P (6th Cir.)
File Name:  02a0128p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

In re: WORTH A. SALLEE and
SANDRA M. SALLEE,
          *Debtors.*

————————————

WORTH A. SALLEE, SANDRA
M. SALLEE, and JOHN
WILSON, Trustee,
          *Plaintiffs-Appellees/*
          *Cross-Appellants,*


          *v.*


FORT KNOX NATIONAL
BANK, N.A. and DICKINSON
FINANCIAL CORPORATION,
          *Defendants-Appellants/*
          *Cross-Appellees.*

Nos. 00-5484/5652

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00779—Jennifer B. Coffman, District Judge.

Argued:  September 19, 2001

Decided and Filed:  April 15, 2002

Before:  BATCHELDER and COLE, Circuit Judges;
GWIN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Philip W. Bledsoe, SHUGHART, THOMSON & KILROY, Kansas City, Missouri, for Appellants.  Douglas G. Sharp, MORGAN & POTTINGER, Louisville, Kentucky, for Appellees.  **ON BRIEF:** Philip W. Bledsoe, Richard M. Paul III, SHUGHART, THOMSON & KILROY, Kansas City, Missouri, Cathy S. Pike, Russell H. Saunders, WEBER & ROSE, Louisville, Kentucky, for Appellants.  Douglas G. Sharp, John T. McGarvey, MORGAN & POTTINGER, Louisville, Kentucky, for Appellees.

GWIN, D. J., delivered the opinion of the court, in which COLE, J., joined. BATCHELDER, J. (pp. 42-44), delivered a separate opinion concurring in part and concurring in the judgment.

_____

**OPINION**

_____

GWIN, District Judge.  With these appeals, we review the judgment of the U.S. Bankruptcy Court for the Western District of Kentucky.  That court gave judgment of $3,009,998.25 against Appellant Fort Knox National Bank ("Fort Knox Bank") on Plaintiff Worth and Sandra Sallee's breach of a fiduciary relationship and fraud claims.  This case arises from a complicated series of loans that the Sallees used to purchase and operate a convenience store and laundromat in the Fort Knox, Kentucky area.  The case presents the

_____

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

claiming damages or rescinding  the contract.  *Sanford Constr. Co. v. S & H Contractors, Inc.*, 443 S.W.2d 227, 236 (Ky. 1969).

In this case, the Sallees claim that they were induced to purchase the laundromat by Fort Knox Bank's fraudulent representations.  The Sallees' claim is one for fraudulent inducement.  The election that Kentucky law requires them to make is the election of remedies—they may elect to affirm the contract and pursue damages, or they may elect to rescind the contract.  The majority opinion says that since the Sallees "affirmed the laundromat loan transaction" they may sue only "for fraudulent misrepresentation, but not for fraudulent inducement." This is an incorrect statement of Kentucky law.  There is no issue here of fraudulent misrepresentation versus fraudulent inducement. Here, a fraudulent misrepresentation by Fort Knox Bank induced the Sallees to purchase the laundromat.

The proper distinction between fraudulent misrepresentation and inducement derives from the context in which the fraudulent misrepresentation occurred.  If the misrepresentation occurred with the "intention of inducing" a party to act, the result is fraudulent inducement.  If the misrepresentation did not occur within the context of inducing another to act, but instead was a misrepresentation for other purposes, the result is another form of fraud, for example, fraud in the  factum, where the document signed was itself misrepresented.

I agree with the result reached by the majority.  In its order granting Fort Knox Bank's motion to appoint a receiver, the state court explicitly told the Sallees that they would have to make an election of remedies.  The Sallees, however, have made no specific election, and it is undisputed that they have kept the money they borrowed from Fort Knox Bank.  As a result, they have condoned the fraud by affirming the contract. *Terrill v. A.H. Carpenter*, 143 F. Supp. 747, 753 (E.D. Ky. 1956).  Under Kentucky law, as found by the majority, the Sallees may recover the difference between the value of the

---

**CONCURRENCE**

---

ALICE M. BATCHELDER, Circuit Judge, concurring in part and concurring in judgment. I concur in the judgment of the majority opinion. I write separately with regard to the majority's statement of Kentucky law relating to the election of remedies for fraudulent inducement.

Fort Knox Bank argues on appeal—erroneously, I believe— that the Sallees, under Kentucky law, were required to elect whether they sought damages for fraudulent misrepresentation or fraudulent inducement. The majority opinion adopts the Bank's erroneous characterization of Kentucky law.

Fraud in the inducement requires misrepresentation. Black's Law Dictionary defines fraud in the inducement thus:

Fraud connected with underlying transaction and not with the nature of the contract or document signed. Misrepresentation as to the terms, quality or other aspects of a contractual relation, venture or other transaction that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken.

BLACK'S LAW DICTIONARY (6th ed. 1990). In Kentucky, when a party is *induced* by a fraudulent *misrepresentation* to enter into a contract, that party must elect to either: (1) "affirm the contract and recover damages in tort for the fraud;" or (2) "disaffirm the contract and recover the consideration with which he has parted." *H.C. Hanson v. Am. Nat'l Bank & Trust Co.*, 865 S.W.2d 302, 306 (Ky. 1993). The required election is not between a cause of action for fraudulent misrepresentation and one for fraudulent inducement. Rather, the election required is between the available remedies—either affirming the contract and

unhappy collision between Fort Knox Bank's bad banking practices and the Sallees' business naivete and incompetence.

In wading through the morass created by Fort Knox Bank and the Sallees, we first describe the factual background upon which the Sallees base their claim of a fiduciary relationship with Fort Knox Bank. After considering this background, we find that Fort Knox Bank's relationship with the Sallees did not create a duty in Fort Knox Bank to act primarily in the Sallees' interest. The relationship between a bank and a borrower does not ordinarily impose a fiduciary duty upon the bank. While the Sallees may have been childlike in trusting Fort Knox Bank's representatives, we find no reasonable person in their position would believe Fort Knox Bank acted on the Sallees' behalf in lending monies to the Sallees.

After discussing the Sallees' claim that Fort Knox Bank owed them a fiduciary duty, we examine the bankruptcy court's finding that the Sallees established their fraud claim. Regarding the fraud claim, Fort Knox Bank argues that the Sallees cannot show reasonable reliance unless they can establish their fiduciary claim. However, under Kentucky law, a duty to disclose may arise from a partial disclosure of information or from circumstances in which one party to a contract has superior knowledge and is expected to reveal it. We find that although Fort Knox Bank could refuse to give the Sallees the laundromat appraisals in its possession, it could not reveal one appraisal while keeping secret other appraisals that would show the appraiser had no idea of the laundromat's value.

Finding sufficient evidence to support the Sallees' fraud claim, we next examine Fort Knox Bank's argument that the Sallees released all claims against Fort Knox Bank by signing two Extension/Waiver Agreements ("extension agreement") in August and December 1989. The bankruptcy court found the extension agreement's release language insufficiently broad to prevent the Sallees' claims. Upon appeal, the district court found the release language broad enough to prevent the Sallees' claims. Nonetheless, the district court found Fort

Knox Bank fraudulently procured the Sallees' assent to the extension agreement. Because we hold the evidence supports the district court's finding that Fort Knox Bank fraudulently induced the Sallees' execution of the release, we deny Fort Knox Bank's argument that the release prevents the Sallees' claims.

After finding that the Sallees have established their fraud claim, we turn to the bankruptcy court's determination of damages. In its judgment, the bankruptcy court awarded the Sallees damages for fraudulent misrepresentation and fraudulent inducement. We find that Kentucky law required the Sallees to elect between a claim for fraudulent misrepresentation or one for fraudulent inducement. Because the Sallees elected to obtain damages for fraudulent misrepresentation, they could not obtain damages for fraudulent inducement. As a result, the bankruptcy court erred in awarding much of the damages found.

The bankruptcy and district courts found support for an award of punitive damages. We find sufficient evidence to support this finding. The bankruptcy and district courts calculated the punitive damage award as 75% of the compensatory damages. Because we find that the district and bankruptcy courts significantly overstate the compensatory damages, we affirm the district court's order to remand this case to the bankruptcy court to recalculate the punitive damage award.

## I.

### A. Procedural Background

Appellant Fort Knox Bank sued Appellees Worth and Sandra Sallee in the Circuit Court of Hardin County, Kentucky. In its complaint, Fort Knox Bank alleged the Sallees had defaulted on a $575,000 promissory note secured by a mortgage. Fort Knox Bank asked for judgment on the note with accrued interest. It also asked that the property securing the note be sold and the proceeds be applied against the loan.

district court correctly allowed punitive damages but we remand the case back to the bankruptcy court for a new determination of those damages.

The judgment of the United States District Court for the Western District of Kentucky in case 00-5484 and 00-5652 is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** to the United States Bankruptcy Court for the Western District of Kentucky.

In its sale of Fort Knox Bank to Golden Financial Corporation, Dickinson Financial agreed to indemnify Golden Financial for any judgment against Fort Knox Bank. Without this indemnification, Golden Financial would have born the punitive damages. Dickinson Financial became liable for the punitive damages only because it agreed to accept that risk in its contract with Golden Financial. By agreeing to indemnify this risk, Dickinson Financial received consideration from Golden Financial. Dickinson Financial either sold Fort Knox Bank at a higher price or completed a sale it would not otherwise have made. We see no reason to relieve Dickinson Financial of the risk it voluntarily assumed.[21]

Dickinson Financial continues to work in the financial field. An award of punitive damages will discourage Dickinson from allowing similar conduct at other locations. As important, punitive damages will discourage other similarly situated banks from engaging in like conduct.

However, because the bankruptcy court based its punitive damage award on 75% of the compensatory damages, we remand the case back to the bankruptcy court for a new determination of punitive damages.

### III. Conclusion

The district court erred in finding Fort Knox Bank had a fiduciary relationship with the Sallees. The district court correctly held the Sallees' signing of the extension agreement did not waive their claims against Fort Knox Bank. The bankruptcy court correctly found for the Sallees on their fraud claim.

With respect to damages, the district court correctly recalculated the Sallees' compensatory damages on their fraudulent misrepresentation claim. The district court erred when it allowed damages for fraudulent inducement. The

---

[21]Dickinson Financial sold Fort Knox Bank to Golden Financial for $1.7 million. In addition, it upstreamed $2.5 million of surplus capital.

The Sallees counterclaimed and then filed a petition for bankruptcy in the U.S. Bankruptcy Court for the Western District of Kentucky. The Sallees removed this lawsuit to bankruptcy court as an adversary proceeding related to a case under Title 11. *See* 28 U.S.C. § 1452 (2001). The Sallees then added a claim against third-party defendant/appellant Dickinson Financial Corporation ("Dickinson Financial"). Dickinson Financial was the corporate parent of Fort Knox Bank. The bankruptcy court had jurisdiction over this case under 28 U.S.C. §§ 157(b) and 1334(b) (2001).

After the bankruptcy court entered judgment against Fort Knox Bank, the appellants appealed to the district court, which reviewed the decision of the bankruptcy court under 28 U.S.C. § 158(a) (2001). The district court reversed in part and affirmed in part the bankruptcy court's judgment. Appellants Fort Knox Bank and Dickinson Financial then appealed to this Court and the Sallees cross-appealed.

### B. Factual Background

Because this factually complex case comes upon appeal from the record made at the bankruptcy court, we rely upon the bankruptcy court's factual findings.[1]

Appellant Fort Knox Bank was a small banking institution on and near the military post at Fort Knox, Kentucky. It offered unsophisticated banking services to military personnel and businesses in the surrounding community. At times relevant to this case, Dickinson Financial, a holding company, owned Fort Knox Bank.[2]

---

[1]The appellants do not directly challenge the factual findings of the bankruptcy court.

[2]Dickinson Financial sold Fort Knox Bank's assets to Golden Financial Corporation after Fort Knox Bank began this litigation. As part of the sale of these assets, Dickinson Financial agreed to indemnify Golden Financial Corporation for any judgments entered against Fort Knox Bank.

Fort Knox Bank primarily provided consumer banking services, with only a modest amount of commercial lending. This practice changed in the mid- to late-1980s. Like many other misguided lending institutions then, Fort Knox Bank decided to increase its commercial lending, which ultimately grew to approximately 40% of Fort Knox Bank's total loan portfolio.

Fort Knox Bank gave responsibility for commercial lending to Senior Loan Officer Ken Logsdon ("Logsdon") and Assistant Loan Officer Victoria Cooney ("Cooney"). Each possessed a dangerous combination of inexperience and incompetence.

Displaying the "go-go" mentality that infected banking in the mid-1980s, Fort Knox Bank made a series of loans to Fred W. Bramblett ("Bramblett") and his family to finance a variety of real estate projects. Logsdon and Cooney authorized and supervised these loans.

The Bramblett family included Fred, Sr. and his wife Pearl, and their two sons, Fred W. and James Bramblett. They worked in the construction field and began borrowing large amounts from Fort Knox Bank in the mid-1970s. The Brambletts helped each other in their endeavors and routinely transferred property and loans between themselves.

Reflecting Logsdon and Cooney's incompetence, Fort Knox Bank poorly documented the loans made to Bramblett in the mid-1980's, loosely collateralized the loans, and made the loans with little financial information. Moreover, Fort Knox Bank continued this series of loans even though Bramblett's endeavors consistently lost money.

By the fall 1987, Fort Knox Bank's easy lending policy and Bramblett's incompetence resulted in Fort Knox Bank having several hundred thousand dollars of bad loans. Rather than face the consequences of his questionable lending practices, Senior Loan Officer Logsdon agreed to a generalized workout strategy with Bramblett. Under this workout strategy, Fort Knox Bank would give Bramblett, his businesses, and various

The district court, in accepting the bankruptcy court's assessment of punitive damages, specifically rejected the argument that assessing damages has no deterrent effect because Dickinson Financial has sold Fort Knox Bank. Noting that Dickinson Financial controlled Fort Knox Bank, the district court questioned whether Dickinson Financial's inadequate supervision of Fort Knox Bank's lending practices had contributed to the damages.[20] Of greater importance, the district court found an assessment of punitive damages would "serve to deter other banks, both those still owned by Dickinson Financial and independent banks, from similar conduct, furthering the purpose of an award of punitive damages." (District Court Memorandum Opinion and Order at 30).

We agree that punitive damages should be awarded. Punitive damages have a twofold effect. They punish wrongdoers and deter others.

We find unpersuasive the appellant's argument that the bankruptcy court should not have levied punitive damages because Fort Knox Bank no longer exists. While the appellant cites cases where punitive damages were not assessed based on the idea that only a wrongdoer should pay such damages, they are factually distinguishable from this case. *See Barnes v. Smith*, 305 F.2d 226 (10th Cir. 1962) (no punitive damages against estate of a deceased wrongdoer); *Fehrenbacher v. Quackenbush*, 759 F. Supp. 1516 (D. Kan. 1991) (same); *Kentucky Central Ins. Co. v. Schneider*, 15 S.W.3d 373, 375–76 (Ky. 2000) (award of punitive damages overturned because underinsured motorist coverage definition of "bodily injury" does not cover punitive damages; dicta further says such an award is ludicrous as *victim*'s insurance would have to pay).

---

[20]The bankruptcy court found that "other than their failure to more carefully monitor Fort Knox Bank, we can find little fault with the actions of Dickinson Financial and its owner." (Bankruptcy Court Judgment at 48).

should be used to pay off a loan from Fort Knox Bank. The Sallees also agreed to use part of these proceeds to satisfy debts they owed to Hardin County Bank. They cannot plausibly claim they retained tax deferred status after voluntarily selling the stock and applying some of the proceeds to their business debts.

### F. Punitive Damages

After trial, the bankruptcy court awarded punitive damages of $1,289,999.25 against Fort Knox Bank because of its fraud. The appellant says the punitive damages award should be set aside because Fort Knox Bank, the wrongdoer, no longer exists. As a provision of the contract selling Fort Knox Bank, Dickinson Financial agreed to pay any damages in this case. Appellants argue that the bankruptcy court should not award any punitive damages against Dickinson Financial given that the bankruptcy court absolved Dickinson Financial from all liability in the case.

The bankruptcy court awarded punitive damages under Kentucky Revised Statutes Annotated §§ 411.184(1)(f) & 411.184(2) (Banks-Baldwin 2001).

> (1) As used in this section and KRS 411.186, unless the context requires otherwise:
>
>     . . . .
>   (f) "Punitive damages" includes exemplary damages and means damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future.
>
>     . . . .
> (2) A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice.

Ky. Rev. Stat. Ann. §§ 411.184(1)(f) & 411.184(2).

family members and associates additional loans. Bramblett would use the new loans to keep his obligations to Fort Knox Bank afloat until Bramblett could divest the properties. Logsdon overstated the value of the collateral securing the original loans to allow him to lend Bramblett enough money to keep his old debts current.

Bramblett used the additional loans to keep past loans from going bad until he could turn his investments around or sell them. If necessary, Logsdon indicated that Fort Knox Bank would consider financing the purchase of one or more of Bramblett's properties, especially if the purchase could be secured with better collateral than the security offered by the Brambletts.

Throughout 1989, Bramblett looked for persons to purchase the Brambletts' properties. When found, Senior Loan Officer Logsdon helped arrange financing for the purchases of the various properties.[3]

In putting together loan packages for the purchase of Bramblett's assets, Senior Loan Officer Logsdon and Bramblett often used appraiser David Banet. Banet's poor work struck the bankruptcy court. "[T]his Court notes that, except for other similar appraisals made by Banet for Fort Knox Bank, [the appraisal involved in this case] is the worst prepared appraisal it has had the opportunity to review in its past ten years on the bench." (Bankruptcy Court Judgment at 10). Importantly, Banet's appraisals disingenuously found real estate had the exact value needed to support whatever loan amount that Logsdon wanted.

Into this sorry mix stepped Worth and Sandra Sallee. Worth Sallee moved to Elizabethtown, Kentucky in 1974 after his employer, Lowe's, Inc. ("Lowe's"), promoted him. In 1980, Lowe's promoted Worth Sallee to store manager.

---

[3]Fred W. Bramblett, James Bramblett, their parents, and related entities all owned some of the assets.

While in this position he met the Brambletts, who made purchases at Lowe's.

Worth Sallee participated in an ESOP and profit-sharing plan while working at Lowe's. During his tenure with the company, he accumulated several thousand shares of Lowe's stock in these plans.

In 1988, Worth Sallee began looking for a business to purchase or operate after Lowe's transferred him to an Indiana store. During his search for a business to buy, Worth Sallee approached Jimmy Bramblett about a convenience store and car wash Jimmy built and was operating. After negotiating for a month or so, the Sallees agreed to purchase Jimmy Bramblett's convenience store for $100,500.[4] In the agreement for the sale of the convenience store, the Sallees did not purchase the real estate. Instead, Jimmy Bramblett leased the real property to the Sallees for five years at $5,000 per month and granted the Sallees an option to purchase the real estate for $550,000.

After they agreed on the purchase, Jimmy Bramblett suggested to Worth Sallee that he obtain financing for the convenience store from Fort Knox Bank. Jimmy Bramblett then set up a meeting with Senior Loan Officer Logsdon to try to secure funding for the purchase. Worth Sallee had never done business with Logsdon before. Senior Loan Officer Logsdon agreed to have Fort Knox Bank lend the Sallees $100,000.[5] Although Logsdon and Worth Sallee discussed the assignment of Worth Sallee's pension fund to Fort Knox Bank as collateral, no assignment was made.

---

[4] The convenience store was titled to a related entity known as Bramblett Properties, Inc.

[5] Fort Knox Bank provided this money in two separate loans. On August 3, 1988, Fort Knox Bank loaned the Sallees $80,000. One week later, Fort Knox Bank loaned the Sallees $20,000.

would have been valid in this case is governed by 26 U.S.C. § 402(c)(4).

Section 402(c), and its accompanying regulation, 26 C.F.R. § 1.402(c)-2,A-4(d), direct that an amount is not eligible for rollover into an IRA if the amount is a "deemed distribution" under 26 U.S.C. §72(p). Section 72(p) provides that a person who "assigns (or agrees to assign) . . . any portion of his interest" in an ESOP is deemed to have distributed that interest. 26 U.S.C. § 72(p). Here, the Sallees twice assigned or agreed to assign their interest in Worth's ESOP to Hardin County Bank. This destroyed, prior to any representations made by Fort Knox Bank, any ability the Sallees may have had to roll the ESOP into an IRA. Fort Knox Bank cannot be held liable for any loss the Sallees suffered as a result of the loss of tax-deferred status caused by the Sallees themselves.

As found by the bankruptcy court:

In October of 1988, the Sallees obtained a new loan from the Hardin County Bank & Trust Co. in the amount of $125,576.00. . . . The Sallees also said they consented to have Worth's ESOP and Profit Sharing plan stock "assigned" to Hardin County. While this Court believes Worth Sallee's testimony that he did not intend to pledge his Lowes stock to Hardin County he did consent to an assignment of the stock to Hardin County, . . .

(Bankruptcy Court Judgment at 13–14).

Even if the effort to assign the stock to Hardin County Bank did not defeat the tax-deferred benefit, the later assignment and sale of some of the stock would end the tax-deferred status. The Sallees authorized their broker to sell 5,999 shares of Lowe's stock held by Worth Sallee in his retirement plan. As the result of this sale, they received more than $178,000.

After the brokerage firm mailed Sallees the proceeds, Worth Sallee endorsed the check and delivered it to Fort Knox Bank. Worth Sallee consented that at least $50,000

find the bankruptcy court erred when it awarded damages for fraud in the inducement, we find the award of damages associated with the pledged Lowe's stock was error. Therefore, we do not reach the issue whether the damages from fraudulent inducement should include damages from the Sallees' loss of a favored tax treatment for the Lowe's stock. Nonetheless, we offer a few comments upon the question.

The bankruptcy court clearly erred when it gave any of the damages flowing from fraudulent inducement. The bankruptcy court also erred regarding the proper measurement of damages that would have been available even if the Sallees had retained their right to make claims for damages for fraudulent inducement.

The bankruptcy court held that "a properly established IRA, created through a valid rollover of the ESOP stock would have existed but for the fraud of Logsdon, Cooney and [Fort Knox Bank]." (Bankruptcy Court Judgment at 64). The bankruptcy court wrongly attributed liability for the loss of the tax-deferred status of the Sallees' ESOP to Fort Knox Bank.

As to whether the Sallees could recover the lost value of stock appreciation, Fort Knox Bank argues that the Sallees' cannot recover damages resulting from the lost appreciation of Worth Sallees' stock held in a tax-deferred account. Seeking to counter this argument, Worth Sallee makes the improbable argument that when he executed an assignment and directed Lowe's to give custody of his stock to Fort Knox Bank he did not intend to create a security interest in Fort Knox Bank.

Fort Knox Bank did not cause any loss of the tax-deferred status of Worth Sallee's ESOP. Before pledging the stock to Fort Knox Bank in the laundromat transaction, the Sallees had twice pledged the ESOP stock to the Hardin County Bank. Section 408 of Title 26 of the U.S. Code governs IRAs and requires that, except in the case of a rollover contribution to an IRA, the amount of money one may place in an IRA is limited under 26 U.S.C. § 219(b)(1)(A). Whether a rollover

Shortly after purchasing the convenience store, the Sallees obtained a better loan from the Hardin County Bank & Trust Company ("Hardin County Bank"). In October 1988, the Hardin County Bank lent the Sallees $125,576. Hardin County Bank lent the money though the convenience store made little profit and the Sallees were having cash flow problems. The Sallees used the loan to pay off the Sallees' Fort Knox Bank loan.

The Sallees believed a security interest in the convenience store's assets and a second mortgage on the Sallees' home secured the Hardin County Bank loan. Beyond this security, the Sallees agreed to have Worth Sallee's profit-sharing plan stock "assigned" to Hardin County Bank. Worth Sallee's attempt to assign his stock to Hardin County Bank ultimately failed because he never delivered the stock certificates to Hardin County Bank.

During the fall 1988, the Sallees continued having cash flow problems with the convenience store. In December 1988, the Sallees obtained an additional working capital loan of $30,300 from Hardin County Bank. As collateral for the loan, the Sallees again attempted to grant a security interest in Worth's profit-sharing stock account to Hardin County Bank.[6] Apparently cautious as the result of the Sallees' failure to operate the convenience store at a profit, Hardin County Bank advised them that it would not give further loans. Hardin County Bank recommended the Sallees obtain financing for gasoline purchases from another bank.

Having tapped out their borrowing ability at Hardin County Bank, in January 1989, the Sallees returned to Fort Knox Bank for financing for gasoline purchases. Assistant Loan Officer Cooney supervised their application. On January 24, 1989, Fort Knox Bank lent the Sallees $50,000 for the

---

[6] The demand note purported to grant a security interest only in the profit sharing account stock but the assignment executed by the Sallees gives a security interest in both the ESOP and profit sharing account stock.

purchase of gasoline. Again, Worth Sallee secured this loan through a purported security interest in his ESOP and profit-sharing plan stock.

While the Sallees unsuccessfully ran their convenience store, the Bramblett family tried to unload other assets securing their loans with Fort Knox Bank. As part of this plan, Fred W. Bramblett approached the Sallees and offered to sell them the laundromat next to the Sallees' convenience store.

Jimmy Bramblett had originally owned the laundromat. However, on February 25, 1988, his parents purchased the laundromat so he would not default on a loan to Fort Knox Bank. The Bramblett parents purchased the laundromat for $375,200. To make the purchase, Fort Knox Bank lent the Bramblett parents the entire $375,200. To justify such a loan, Fort Knox Bank used Banet's one-page appraisal of the laundromat property that said its market value was $469,000.

The Brambletts' poor business practices continued, and the Bramblett parents returned to Fort Knox Bank a year later for another loan on the laundromat. Fort Knox Bank lent them an additional $142,000. Although the Bramblett parents described the loan as intended for working capital, the Bramblett parents used all but $39,000 of the loan to pay Fred W. Bramblett's debt service and bank fees on other loans with Fort Knox Bank.

Fort Knox Bank justified the additional loan with a new appraisal by Banet. On the new appraisal, Banet valued the laundromat property at $647,000. Fort Knox Bank knew Banet increased the appraised value of the laundromat 38% in little more than one year. Banet raised the appraised value even though the Bramblett parents made no improvements to the property, were not making any significant money on the laundromat, and could not service the laundromat debt from its income.

It was at this time that Fred W. Bramblett approached Worth Sallee and offered to sell him the laundromat. The

In their cross appeal from the district court's judgment, the Sallees say the bankruptcy court correctly calculated their damages by subtracting the laundromat's price at a United States Marshall's sale from the laundromat's value as represented by Fort Knox Bank.

The bankruptcy court awarded the Sallees $549,999 as damages for the purchase of the laundromat. The bankruptcy court determined this amount by finding the difference between the appraisal that Fort Knox Bank gave them and the value of the laundromat when sold at a United States Marshall sale four years later. The district court lowered the damage award by substituting the actual price of the laundromat at the time of the misrepresentation, as determined by an appraisal, for the price of the laundromat at the United States Marshall's sale.

The district court correctly held the bankruptcy court erred in its calculation. "The Bankruptcy Court's award of $549,999 was clearly erroneous as it not only gave the Sallees the benefit of their bargain but also compensated them for economic changes affecting the value of the laundromat, independent of the fraud." (District Court Memorandum Opinion and Order at 27). The proper damage award is $421,000, the difference between the laundromat's final appraised value and what it was actually worth on the day the Sallees purchased it.

### 3. Discussion of whether damages recoverable for lost stock appreciation

As discussed above, the Sallees declined the state court's opportunity to rescind its transaction with Fort Knox Bank and sue for damages arising from the Bank's fraudulent inducement. Having declined the opportunity to make a consequential damage claim, the Sallees are limited to damages representing the difference in the value of the laundromat as represented and its actual value. Because we

appropriate if the representation had been true.

and return the principal lent or affirm the contract and counterclaim for damages. On January 6, 1992, the Sallees filed their counterclaim.

The Sallees affirmed the laundromat loan transaction with full knowledge of the facts. This mandatory election allows them to sue for fraudulent misrepresentation, but not for fraudulent inducement. The Sallees are therefore precluded from seeking damages flowing from the inducement of the laundromat purchase.

## 2. Calculation of damages for fraudulent misrepresentation

Having found that the Sallees cannot recover damages for fraudulent inducement, we consider whether the bankruptcy court correctly determined the damages available for fraudulent misrepresentation. Under Kentucky law, the Sallees may recover the difference between the value of the property as it was fraudulently represented and the value of the property had it been properly represented. *See Dempsey v. Marshall*, 344 S.W.2d 606, 607 (Ky. 1961). "In such cases, the measure is generally held to be the difference between the actual and represented value of the business or property." *Id.*; *see also* Restatement (Second) of Torts § 549 (1977).[19]

_____

[19]The Restatement (Second) of Torts § 549 states the general rule:

(1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including

(a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it;

Under this section of the Restatement, additional damages could only be recovered (1) when the financial position of a third person is misrepresented for the purpose of inducing the recipient to extend credit to him, (2) when a buyer, in reliance upon the misrepresentation, uses the subject matter of the sale in the belief that it is appropriate for a use for which it is harmfully inappropriate, or (3) when he has incurred expenses in preparation for a use of the article for which it would have been

laundromat's game room attracted people Worth Sallee believed detracted from his adjacent convenience store. Worth Sallee became interested in buying the laundromat if he could replace the game room with washing equipment as a way to get rid of this undesirable traffic.

Both the Brambletts and Fort Knox Bank wanted to sell the laundromat. A sale to the Sallees would help the bank by closing a nonperforming Bramblett loan that was most likely undersecured. Equally important, the Sallees could offer security for their loan, a striking contrast to the Brambletts. Furthermore, if the Sallees believed the $647,000 appraisal, Fort Knox Bank and the Brambletts could receive an additional benefit of selling the laundromat for more than it was worth. If they sold the laundromat for more than it was worth, the Brambletts and Fort Knox would both benefit because of the Brambletts' reduced overall level of borrowing.

After Worth Sallee told Fred W. Bramblett that he might be interested in purchasing the laundromat, Fort Knox Bank vigorously pushed the sale. Assistant Loan Officer Cooney and Senior Loan Officer Logsdon approached the Sallees about financing their purchase of the laundromat. Logsdon assured Worth Sallee he was getting a good deal, that Fort Knox Bank would provide 100% financing, and that the Sallees would likely receive easy credit on future business loans.

In encouraging the Sallees to buy the laundromat, Bank Officers Cooney and Logsdon represented that Fort Knox Bank controlled the Brambletts and that the Sallees were purchasing the laundromat from the Bank.[7] To foster the

_____

[7]Worth Sallee testified:

Q.   . . . Can you tell me why you're talking to the bank and what the bank said, if anything, about that?

A.   Oh, okay. I'm sorry. Vickie [Conlon] represented to me

sale, Fort Knox Bank showed the Sallees a pro-forma and site survey. Assistant Loan Officer Cooney represented to Worth Sallee that these documents were taken from Fort Knox Bank's files on the Brambletts.

Cooney and Logsdon gave the pro-forma and site survey to the Sallees as evidence of the laundromat's potential profitability. The pro-forma and site survey suggested the laundromat would gross between $152,000 and $200,585 per year. Worth Sallee testified that Cooney called him on May 30, 1988, before the closing, and said an appraiser had appraised the laundromat for $750,000. (Joint Appendix at 871).

Importantly, Cooney and Logsdon never revealed to the Sallees that the laundromat's appraised value rose from $469,000 in February 1988, to $647,000 in March 1989, and then to $726,000 in May 1989. Banet did all three appraisals.[8]

On May 31, 1989, the Sallees purchased the laundromat. Based on Banet's final appraisal, Fort Knox Bank lent the

---

that she was in control of Freddie [Bramblett]. Freddie was apparently in some financial difficulty. And she told me that.

* * *

Q.  How did you think you were going to buy the laundromat from him [Jimmy Bramblett] without getting involved?

A.  I wasn't buying anything from him. Vicki clearly told me that I would be dealing with the bank. And that I would be buying this from the bank.

(Joint Appendix at 856–57).

[8] After reviewing this series of appraisals, the bankruptcy court found "that this series of appraisals are, bluntly put, fraudulent, with the values being determined by Fort Knox Bank loan formula rather than any economic factors." (Bankruptcy Court Judgment at 25-26).

---

any alleged damages; or (2) affirm the transactions and counterclaim for any damages caused by the alleged fraud. Manifestly, proof of fraudulent inducement does not permit them to simply keep the Bank's money.

*Fort Knox Nat'l Bank v. Sallee,* No. 90-CI-1440, at *3 (Hardin County Ct. Aug. 31, 1991).

The Sallees elected to keep the money. By electing to keep the bank's money, Fort Knox Bank says the Sallees gave up their right to seek damages for fraudulent inducement.

A party claiming fraudulent inducement must normally rescind the contract. Otherwise, the party is limited to recovering the difference in the value of the property as represented and its actual value. In *Moore, Owen, Thomas & Co.,* we described the Kentucky rule on fraudulent inducement damages:

> Under Kentucky law, "one claiming to have been defrauded into making a contract has an option either to disaffirm the contract and seek its rescission or to affirm the contract and seek his remedy by an action for damages; he may not follow inconsistent remedies. He has but one election, and if he affirms the contract, his election is irrevocable and he condones the fraud."

992 F.2d at 1445 (quoting *Hampton v. Suter,* 330 S.W.2d 402, 406 (Ky. 1959) (citations omitted)); *see also Patel v. Patel,* 706 S.W.2d 3, 4 (Ky. Ct. App. 1986) (reiterating the rule that when fraud has been committed in obtaining a contract, a party can either affirm the contract and recover damages due to the fraud or rescind the contract).

Under Kentucky law, the Sallees "condone[d] the fraud" by affirming the contract. *Sanford Constr. Co., Inc. v. S&H Contractors, Inc.,* 443 S.W.2d 227, 236 (Ky. 1969) (citing *Hampton,* 330 S.W.2d at 406).

In granting Fort Knox Bank's motion to appoint a receiver, the state court told the Sallees they needed to rescind the loan

decide whether the bankruptcy court's computation of damages was proper.

### 1. Whether damages are available for fraudulent inducement

Fort Knox Bank says the Sallees, under Kentucky law, were required to elect whether they sought damages for fraudulent misrepresentation or for fraudulent inducement. Fort Knox Bank says the state court ordered such an election and the Sallees chose to seek damages for fraudulent misrepresentation, not fraudulent inducement. Because of this election, Fort Knox Bank says the bankruptcy court erred when it awarded the Sallees' damages for both fraudulent misrepresentation and fraudulent inducement. We understand Fort Know Bank to argue that under Kentucky law, the remedies available to a party claiming to have been fraudulently induced to enter into a contract are mutually exclusive; the defrauded party may elect either to rescind the contract, return the benefits received and recover the consideration given, or to affirm the contract and recover damages for the fraud. The Sallees argue in their cross appeal that the bankruptcy court's award of damages is correct.

On October 17, 1990, Fort Knox Bank sued the Sallees in the Circuit Court of Hardin County, Kentucky. The bank sued upon the unpaid note and sought foreclosure of the property securing the $575,000 loan. Fort Knox Bank sought a receiver. In opposing the appointment of a receiver, the Sallees argued they had been fraudulently induced to agree to the contract providing for a receiver. The state court ordered the Sallees to elect whether it sought damages for fraudulent inducement or for fraudulent misrepresentations. Specifically, the state court observed:

> A correct interpretation of these principles leaves the Sallees with these options: (1) rescind the transactions by repaying or tendering the principal sum of money received from the Bank in exchange for the note, raising fraudulent inducement as an affirmative defense to any claim for accumulated interest and/or counterclaiming for

Sallees $575,000 to purchase the laundromat.[9] To secure this loan, the Sallees gave Fort Knox Bank a mortgage on the laundromat and Worth Sallee assigned his ESOP retirement plan stock to Fort Knox Bank.

The Sallees' $575,000 note was a ninety-day term note. Although the note had a ninety-day term, Logsdon and Cooney told the Sallees that Fort Knox Bank would make them a long-term "package" commercial loan so they could consolidate all of their outstanding loans.

In April 1989, while the above events were unfolding, Dickinson Financial began reviewing Fort Knox Bank's loan portfolio. As a result of this highly critical review of Fort Knox Bank's commercial lending practices, Dickinson Financial stopped all commercial lending by Fort Knox Bank on December 18, 1989.

The Sallees soon began losing money on the laundromat and could not service their excessive debt. The Sallees sought an extension of their $575,000 note from Fort Knox Bank. In August 1989, Fort Knox Bank extended the note for an additional ninety days. On December 29, 1989, Fort Knox Bank agreed to a forty-eight-day extension of the repayment dates.

In exchange for each extension, the Sallees signed an extension agreement. These extension agreements released Fort Knox Bank from "any and all rights, claims, or causes of action with respect to the Loan Documents and Collateral." Additionally, Logsdon and Cooney told the Sallees Fort Knox Bank would still provide them with a "package" loan.

---

[9]Fort Knox Bank was not alone in misrepresenting the value of assets. When Worth Sallee applied for the laundromat loan he gave Fort Knox Bank a financial statement showing a net worth of $319,739. The bankruptcy court found Worth Sallee overstated his net worth by over $50,000.

In September 1989, Hardin County Bank learned Worth Sallee had also pledged his ESOP stock to Fort Knox Bank as security for the laundromat loan. Hardin County Bank demanded the Sallees payback their loan or provide additional security. Hardin County Bank threatened the Sallees with legal action if its demand was not met. Logsdon arranged a short term $50,000 loan to pay back Hardin County Bank. Fort Knox Bank made the loan and Worth Sallee consented to having some of his ESOP stock sold to repay the $50,000 loan. Worth Sallee testified that he consented to the sale of his ESOP stock because he believed Fort Knox Bank would replenish his IRA when it gave him the "package" loan. Fort Knox Bank never replenished Worth Sallee's IRA.

When the Sallees signed the December 29, 1989, extension agreement, Senior Loan Officer Logsdon failed to tell them that Fort Knox Bank no longer provided commercial loans. Logsdon apparently hoped he would recover the ability to make commercial loans. Logsdon's hope ended in early January 1990 when Fort Knox Bank justifiably fired him and Cooney.

After January 1990, Dickinson Financial began to work through Fort Knox Bank's troubled commercial loans. Unfortunately for the Sallees, their massive laundromat debt made restructuring their finances impossible.

On October 17, 1990, Fort Knox Bank sued the Sallees in the Circuit Court of Hardin County, Kentucky seeking to foreclose on the property securing the $575,000 loan. The state court appointed a receiver to manage the laundromat and apply the profits to the mortgage indebtedness. Shortly thereafter, the Sallees filed a counterclaim against Fort Knox Bank, alleging, among other things, fraud in the inducement relative to the purchase of the laundromat and breach of the contract for financing the laundromat purchase. The Sallees then filed a petition for bankruptcy. The Hardin County action was removed to the bankruptcy court as an adversary action.

the extension agreement. The Sallees' original note was for ninety days. In describing the original relationship set up by Fort Knox Bank, the bank's commitment letter said the loan would involve a ninety-day construction note and a "20 year amortization w/ 2 year balloon." (Joint Appendix at 466). Given that the Sallees were borrowing the entire cost of the laundromat, the parties knew the Sallees would be unable to pay the ninety-day note at its term. The Sallees reasonably relied upon Senior Loan Officer Logsdon's representation that Fort Knox Bank would offer a consolidation loan.

Having found that Fort Knox Bank obtained the extension agreement through fraud, we reject Fort Knox Bank's argument that the extension agreement prevents the Sallees' claims.

### E.  Compensatory Damages

In its decision, the bankruptcy court awarded the Sallees three items of damages. First, it awarded the Sallees $549,999 in damages for the misrepresented value of the laundromat. It calculated those damages by subtracting the actual value of the laundromat at the time of the Sallees' purchase from the price as represented by Fort Knox Bank. As to its value at the time of sale, the bankruptcy court used the price at which the laundromat sold at a United States Marshall's sale four years later. Second, the bankruptcy court gave the Sallees damages for the lost value of the Sallees' ESOP stock, finding that but for the Bank's fraud, the Sallees would have had a properly established IRA. Third, the bankruptcy court awarded the Sallees punitive damages for Fort Knox Bank's fraudulent actions.

The district court found the bankruptcy court erred when it used the value at the Marshall's sale to set the value of the laundromat at the time the Sallees' purchased the laundromat. Instead, the district court held the value of the laundromat at the time of the sale should be $305,000, the value established by a reliable appraiser. The district court did not disturb the damages award for fraud regarding the ESOP stock. We now

1093 (E.D. Ky. 1990). Fort Knox Bank says the extension agreement did not express an intent to exclude the claims here. The Sallees do not challenge this argument. Instead, they argue fraud procured the extension agreement.

Under Kentucky law, like most jurisdictions, a release obtained by misrepresentation or fraud is unenforceable. *See Hooks v. Cornett, Lewis Coal Co.,* 86 S.W.2d 697, 699 (Ky. 1935); *see also Overburg*, 727 F. Supp. at 1094.

In soliciting the Sallees' execution of the waiver agreement with its release, Logsdon fraudulently induced the Sallees to sign the agreement. On December 18, 1989, Dickinson Financial ended all commercial lending at Fort Knox Bank, including renewals and extensions of existing loans. The bankruptcy court found, "[t]his action in effect ended any chance Logsdon had to make good on his (and Fort Knox Bank's) promise of the package loan. Logsdon did not inform . . . Sallee about this new policy." (Bankruptcy Court Judgment at 39).

Senior Loan Officer Logsdon's records support this interpretation. On December 29, 1989, Logsdon wrote a memo suggesting the Sallees' balance would be placed on monthly payments. The bankruptcy court found that Logsdon represented to the Sallees on December 29, 1989, that he would extend their debt until he could put together the "package" loan. The bankruptcy court also found that the Sallees signed the extension agreement because of Logsdon's representation concerning the "package" loan.

Accordingly, when the Sallees signed the extension agreement on December 29, 1989, Logsdon knew he did not have the power to complete his promise of an additional loan to the Sallees. As described above, when Logsdon made a representation regarding a future consolidation loan he created a duty to reveal the whole truth. *See Dennis*, 43 S.W.2d at 23.

Logsdon's representation that Fort Knox Bank would give a long term loan was critical in the Sallees' decision to sign

Before trial, Fort Knox Bank moved the bankruptcy court for summary judgment. In its motion for summary judgment, Fort Knox Bank argued that the extension agreement released Fort Knox Bank from liability on the Sallees' claims. The bankruptcy court denied the motion, holding that the phrase "any and all rights, claims, or causes of action with respect to the loan documents and collateral" was not broad enough to cover any of the Sallees' claims.

The trial lasted for thirty-eight days. On September 15, 1998, the bankruptcy court entered judgment in favor of the Sallees. The bankruptcy court found Fort Knox Bank owed a fiduciary duty to the Sallees and breached that duty by failing to reveal material facts concerning the loan. The bankruptcy court also found that Fort Knox Bank defrauded the Sallees by misrepresenting the value of the laundromat. Finally, the bankruptcy court found Fort Knox Bank defrauded Worth Sallee by leading him to believe that his ESOP stock taken as collateral was in an IRA. The court rejected the Sallees' other claims. The bankruptcy court absolved Dickinson Financial of any liability.

The bankruptcy court awarded the Sallees compensatory damages of $1,719,999. In finding compensatory damages of $1,719,999, the bankruptcy court awarded damages of $549,999 for the difference between the actual sale price of the laundromat and the price at a later U.S. Marshal's sale. The bankruptcy court also awarded damages of $1,170,000 for the value at trial of Worth Sallee's ESOP stock Fort Knox Bank used as collateral.

Finally, the bankruptcy court awarded punitive damages against Fort Knox Bank of $1,289,999.25. In awarding punitive damages, the bankruptcy court held that "punitive damages, in the amount of 75% of the above awarded compensatory damages . . . are appropriate." (Bankruptcy Court Judgment at 70). In total, the bankruptcy court gave judgment against Fort Knox Bank in the amount of $3,009,998.25.

Fort Knox Bank and Dickinson Financial appealed to the district court. In its Memorandum Opinion and Order, the district court reversed the bankruptcy court's measure of damages, ordered a corresponding reduction in punitive damages, and affirmed the remainder of the judgment.

## II. Discussion

With their appeals, Fort Knox Bank and Dickinson Financial say the bankruptcy and district courts erred in several regards. First, they argue the courts erred in holding that the release in the extension agreement did not preclude the Sallees' claims. Second, they argue the courts erred in concluding that Fort Knox Bank owed a fiduciary duty to the Sallees. Third, the appellants say Fort Knox Bank is not liable for fraud because the Sallees could not prove reasonable reliance without a fiduciary duty. Fourth, they contend the bankruptcy court erred in determining damages. Finally, the appellants say the bankruptcy court should not have awarded punitive damages. The Court reviews these arguments.

## A.  Standard of Review

With regard to Fort Knox Bank and Dickinson Financial's appeals, "[w]hether an appeal comes to our court by way of a district court or the [bankruptcy appellate panel], our review is of the bankruptcy court's decision." *Koenig Sporting Goods v. Morse Rd. Co.* (*In re Koenig Sporting Goods, Inc.*), 203 F.3d 986, 988 (6th Cir. 2000) (quoting *Corzin v. Fordu* (*In re Fordu*), 201 F.3d 693, 696 n.1 (6th Cir. 1999)). As before the district court, a bankruptcy court's conclusions of law are reviewed de novo. *Unsecured Creditors' Comm. of Highland Superstores, Inc. v. Strobeck Real Estate, Inc.* (*In re Highland Superstores, Inc.*), 154 F.3d 573, 576 (6th Cir. 1998). The Court accords discretion to the original bankruptcy court's findings but not to those rendered by the district court. *XL/Datacomp, Inc. v. Wilson* (*In re Omegas Group, Inc.*), 16 F.3d 1443, 1447 (6th Cir. 1994). We are just as capable of interpreting the record as the district court. *Id.*

The bankruptcy court rejected Fort Knox Bank's argument that the Sallees had released their fraud claims when they executed the extension agreement. The bankruptcy court found the extension agreement was not broad enough to release or discharge the Sallees' claims because the waiver only dealt with claims with respect to the loan documents and collateral. The bankruptcy court then found Cooney and Logsdon's promise that Fort Knox Bank would provide them a "package" loan was not fraudulent.

Upon review, the district court found the extension agreement unenforceable because Fort Knox Bank obtained it through fraudulent misrepresentation. In its judgment, the district court found that the promise of a "package" loan had fraudulently caused the Sallees to execute the extension agreement.[18]

Upon appeal to this Court, Fort Knox Bank argues that under Kentucky law the language of the extension agreement is broad enough to release the Sallees' claims. Principally, Fort Knox Bank argues that we presume releases to include all claims unless the parties manifest an intent to exclude certain claims. *See Overberg v. Lusby,* 727 F. Supp. 1091,

---

(Joint Appendix at 593).

[18]The district court reconciled its holding with that of the bankruptcy court:

> On the issue of fraud the court does not discredit the Bankruptcy Court's factual findings or credibility determination. The Bankruptcy Court's determination that Cooney and Logsdon did not defraud the Sallees through their promises of future financing, however, is determinative of a separate legal issue, whether the failure to provide the Package Loan was itself fraudulent, not the issue here, whether the promise of the Package Loan was a misrepresentation made in order to fraudulently induce the Sallees to sign the release. Because the Bankruptcy Court's analysis of the release differed from this court's, the Bankruptcy Judge did not reach the instant issue.

(District Court Memorandum Opinion and Order at 23 n.6).

The record supports the bankruptcy court's finding. The bankruptcy court found that "both Logsdon and Cooney repeatedly assured Worth Sallee that his retirement would be safe and that his ESOP stock, or later the proceeds of it, would be placed in an IRA." (Bankruptcy Court Judgment at 55). Additionally, Worth Sallee testified that Logsdon and Cooney told him the placement of ESOP stock with Fort Knox Bank was simply a requirement that he consolidate all his banking business with Fort Knox Bank. Fort Knox Bank sold the ESOP stock to partially pay one the Sallees' loans and never attempted to replenish the IRA.

## D.  Extension Agreement's Waiver of the Sallees' Fraud Claims

On May 31, 1989, the Sallees gave a ninety day, $575,000 note to Fort Knox Bank. The note was given in anticipation that the Sallees and Fort Knox Bank would agree on a long-term "package" loan. Near August 29, 1989, Fort Knox Bank extended the loan for an additional ninety day period. On December 29, 1989, Fort Knox Bank extended the loan for a further forty-eight day period. In consideration of its agreement to extend the loan, Fort Knox Bank says the Sallees executed an extension agreement that released all claims against the bank.[17]

---

[17]The extension agreement provided, in part:

For the sole consideration of the extension of this debt . . ., the Borrowers . . . hereby waive, release, and forever discharge the Bank from and against any and all rights, claims, or causes of action with respect to the Loan Documents and Collateral which arise from any action or inaction by the Bank with respect to the Loan Documents and Collateral which occurred on or before the date of this agreement . . . . The Borrowers . . . further acknowledge and agree that the Bank is specifically relying upon the representations, warranties, and agreements contained in this paragraph, and that these representations, warranties, and agreements, constitute a material part of the consideration to the Bank without which the Bank would not consent to the extension of the debt permitted by this agreement.

## B.  Breach of Fiduciary Relationship Claim

Before dealing with the Sallees' claim that Fort Knox Bank breached a fiduciary duty, we discuss the nature of a fiduciary relationship and the showing required to establish such a relationship.

A fiduciary relationship creates the highest order of duty imposed by law. If a fiduciary relationship exists, the fiduciary cannot profit from the relationship without the knowledge and permission of the principal. *See, e.g.*, Roy Ryden Anderson, *The Wolf at the Campfire: Understanding Confidential Relationships*, 53 SMU L. Rev. 315, 317 (2000). In a fiduciary relationship, the fiduciary must make every effort to avoid having his own interests conflict with those of the principal. *See id*. When conflict is unavoidable, the fiduciary must place the interests of the principal above his own. *See id.*

A fiduciary duty requires more than the generalized business obligation of good faith and fair dealing. The Texas Supreme Court described this distinction in *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591 (Tex. 1992):

> The duty of good faith and fair dealing merely requires the parties to "deal fairly" with one another and does not encompass the often more onerous burden that requires a party to place the interest of the other party before his own, often attributed to a fiduciary duty.
>
> . . . .
>
> The fact that one businessman trusts another, and relies upon his promise to perform a contract, does not rise to a confidential relationship. Every contract includes an element of confidence and trust that each party will faithfully perform his obligation under the contract. Neither is the fact that the relationship has been a cordial one, of long duration, evidence of a confidential relationship.

823 S.W.2d at 594–95 (internal citations omitted), *superseded by* Tex. Rev. Civ. Stat. Ann. art. 4413, § 6.06(e) (Vernon 2001) (establishing a duty of good faith and fair dealing between parties to a car dealership franchise agreement).

To make out a claim that a fiduciary relationship existed, the party claiming the fiduciary relationship must first show the relationship existed before the transaction that is the subject of the action. *See* Anderson, *supra*, at 324. Second, the party claiming a fiduciary relationship must show that reliance was not merely subjective. *See id.* Third, the party claiming a fiduciary relationship must show that the nature of the relationship imposed a duty upon the fiduciary to act in the principal's interest, even if such action were to the detriment of the fiduciary. *See id.*

As to the second requirement, the party seeking to have a fiduciary relationship recognized must show more than mere subjective trust. *See id.* at 327. An aggrieved party must also show that he trusted the other party to act as a fiduciary and that such trust was reasonable under the circumstances.[10] Only in rare commercial cases is it reasonable to believe the other party will put your interests ahead of their own.

The *Crim Truck & Tractor* decision exemplifies the need for more than simple trust to create a fiduciary relationship. In *Crim Truck & Tractor*, a franchisee claimed his franchisor violated a fiduciary obligation owed to the franchisee when it canceled a forty-year franchise relationship. Although recognizing the parties to the franchise relationship had a long relationship founded upon confidence, the Texas Supreme Court found that no fiduciary obligation to act on the other's behalf was present. *See Crim Truck & Tractor*, 823 S.W.2d

---

[10]Commentator Roy Anderson describes the distinction: "[I]t is one thing to trust someone to deal honestly and quite another to trust someone to put one's interests above his own. Extraordinary facts are necessary to make this latter kind of trust plausible and reasonable." Anderson, *The Wolf at the Campfire: Understanding Confidential Relationships*, 53 SMU L. Rev. 315, 320 (2000).

*Louisville*, 13 F. Supp. 672, 678 (W.D. Ky. 1936), *aff'd in part, rev'd in part*, 88 F.2d 797 (6th Cir. 1937)). Fraudulent concealment implies knowledge of the material fact concealed. *Fields v. Cornett*, 70 S.W.2d 954, 958 (Ky. 1934). A material fact is a fact that affects the conduct of a reasonable person and is likely an inducement of the contract. *Faulkner*, 943 S.W.2d at 638.

In several meetings over a short period, Assistant Loan Officer Cooney gave Worth Sallee a pro forma, a site survey and an appraisal showing the value of the laundromat at $510,000.[16] In its commitment letter, Fort Knox Bank told the Sallees a mortgage would sufficiently secure their note given the laundromat's appraised value of $725,000. (Joint Appendix at 466). Cooney never revealed the February 1988 appraisal, showing a value of $469,000, nor the March 1989 appraisal, showing a value of $647,000.

These other appraisals had obvious importance. First, they show an extreme increase in the value of a floundering laundromat business without describing any justification for the increase. Second, and more important, disclosure of the other appraisals would have shown they were all done by the same appraiser, raising the question of the validity of the appraisals. Having shown the pro forma, the site survey, and one appraisal, Fort Knox Bank could not avoid revealing the other appraisals without making its earlier representations fraudulent.

Beyond finding fraud in Cooney and Logsdon's failure to mention the other appraisals, the bankruptcy court found fraud in their representations regarding the treatment of Worth Sallee's ESOP stock. The bankruptcy court found the Sallees exercised ordinary care in relying on these representations.

---

[16]The record does not identify the author of the $510,000 appraisal. However, Worth Sallee clearly based his decision to purchase the laundromat on the $510,000 appraisal. (Joint Appendix at 1001–03).

not reveal that the company was not producing the materials it implied).

In *Central States Stamping Co. v. Terminal Equip. Co.*, 727 F.2d 1405 (6th Cir. 1984), this Court used the reasoning of an English court in holding a bank sometimes had a duty to speak.

In an English case which was similar to ours, *Hedley Byrne & Co., Ltd. v. Heller & Partners, Ltd.,* [1964] A.C. 465, 486, Lord Reid pointed out that a banker who receives an inquiry about the credit-worthiness of a customer has three courses open. *The banker can decline to give the information; he can give an answer with a clear qualification that it is given and accepted without any responsibility or is given without reflection or research; or, the banker can give an answer without qualification.  Lord Reid concluded that if a banker adopts the third alternative he can be held to have accepted some responsibility for answering carefully or to have accepted a relationship with the inquirer which requires him to exercise such care as circumstances require.*
   *Hedley Byrne* was not a fraud case but involved a negligent answer by a banker.  However, it dealt instructively with the duty to speak once a relationship is established in which the person questioned knows that the inquirer is relying on the fact that he, the person questioned, has superior information.  The duty is particularly clear when the party answering the inquiry benefits directly from the actions of the inquiring party.

727 F.2d at 1409 (emphasis added).

Where one party to a contract knows the other relies on him to disclose all material facts, the duty rests on him not to conceal anything material to the bargain or assume responsibility for damage caused by the concealment.  *See Faulkner Drilling Co. v. Gross*, 943 S.W.2d 634, 638 (Ky. Ct. App. 1997) (citing *Davis v. Comm'rs of Sewerage of City of*

at 595–96 (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) ("'[M]ere subjective trust alone is not enough to transform arms-length dealing into a fiduciary relationship.'")).[11]

In deciding whether Fort Knox Bank owed the Sallees a fiduciary duty, we look to Kentucky law.  While Kentucky has spoken less frequently on the creation of a fiduciary duty, it follows the guidelines described above.

Under Kentucky law, a fiduciary relationship is "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person *to act primarily for another's benefit* in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (emphasis added).

In *Steelvest*, the Kentucky Supreme Court described a fiduciary relationship:

> The relation[ship] may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and *with due regard to the interests of the one reposing confidence*.

*Id.* (quoting *Sec. Trust Co. v. Wilson*, 210 S.W.2d 336, 338 (Ky. 1948)) (emphasis added); *see also Lappas v. Barker*, 375 S.W.2d 248, 251 (Ky. 1963) (stating a fiduciary relationship exists "where a special confidence is reposed in another who . . . is bound to act . . . with regard to the interests of the one reposing confidence").

---

[11]The Texas Supreme Court's reasoning in *Crim Truck & Tractor* is even more persuasive in the light of the Texas Legislature's decision to create a duty of good faith and fair dealing between parties to a car dealership franchise agreement.  *See* Tex. Rev. Civ. St. Ann. art. 4413, § 6.06(e) (Vernon 2001).

Except in special circumstances, a bank does not have a fiduciary relationship with its borrowers. "'[T]he great weight of authority is that while the relationship between a mortgagor and mortgagee is often described as one of trust, technically it is not of a fiduciary character.'" *Forsythe v. BancBoston Mortgage Corp.*, 135 F.3d 1069, 1077 (6th Cir. 1997) (alteration in original) (quoting *Lovell v. W. Nat'l Life Ins. Co.*, 754 S.W.2d 298, 303 (Tex. Ct. App. 1988)) (interpreting Kentucky law to require an express contractual provision to create a fiduciary duty between a mortgagor and mortgagee) (citations omitted); *see also Steelvest*, 807 S.W.2d at 485 ("Courts traditionally view a relationship between a bank and a depositor to be one of debtor-creditor and do not ordinarily impose a fiduciary duty of disclosure upon the bank.").

Kentucky courts have twice imposed a fiduciary duty in the relationship between a bank and a borrower. On both occasions, the bank profited at the borrower's expense from confidential information received from the borrower. In *Steelvest*, the bank used the confidential business plans of one borrower to help one of the borrower's competitors generate new business for the bank. *See* 807 S.W.2d at 485–86.

Similarly, in *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420 (Ky. Ct. App. 1978), the bank usurped a corporate opportunity of one of its borrowers that the borrower revealed to the bank in confidence. The bank used the opportunity for its benefit and to the borrower's detriment. *Henkin*, 566 S.W.2d at 422; *see also Bale v. Mammoth Cave Prod. Credit Ass'n*, 652 S.W.2d 851, 854 (Ky. 1983) (noting that *Henkin* stands for the proposition that a bank's fiduciary duty arises from "confidential relations with its customers").

As described above, banks do not generally have fiduciary relationships with their debtors. This flows from the nature of the creditor-debtor relationship. As a matter of business, banks seek to maximize their earnings by charging interest rates or fees as high as the market will allow. Banks seek as much security for their loans as they can obtain. In contrast,

argue that the bankruptcy court's finding of fraud is supported even without finding a fiduciary relationship.

Under Kentucky law, a party making a fraud claim must prove six elements:

The general rule is that to constitute actionable "fraud" it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*McGuffin v. Smith,* 286 S.W. 884, 886 (Ky. 1926); *see also Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1444 (6th Cir. 1993).

The party asserting a fraud occurred has the burden of proving each element of the *McGuffin* test by clear and convincing evidence. *See Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 955 F.2d 1043, 1051 (6th Cir. 1992).

Under Kentucky law, once a party chooses to make a representation, the party cannot keep secret information needed to make the representation accurate. Although mere silence is not fraudulent absent a duty to disclose, *Hall v. Carter*, 324 S.W.2d 410, 412 (Ky. 1959), a duty to reveal may arise *from a partial disclosure of information*, or from particular circumstances such as where one party to a contract has superior knowledge and is relied upon to disclose that information. *Smith v. General Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998).

More specifically, an early Kentucky court held that "[a] duty to speak may arise from partial disclosure; the speaker being under the duty of saying nothing, or to tell the whole truth." *Dennis v. Thomson*, 43 S.W.2d 18, 23 (Ky. 1931) (holding fraud existed because a company's prospectus did

A generalized trust in other businessmen and businesswomen cannot create a fiduciary relationship. Worth Sallee's unreasonable trust in Assistant Loan Officer Cooney and Senior Loan Officer Logsdon did not create a fiduciary relationship under which Fort Knox Bank has to sublimate its interest to the Sallees.

We find the bankruptcy court clearly erred when it found a fiduciary relationship between the Sallees and Fort Knox Bank. Principally, the bankruptcy court used the wrong standard in finding a fiduciary relationship had arisen. In addition, the bankruptcy court's finding of a fiduciary relationship was clearly erroneous given the position of the parties and the circumstances of the loan. Simply put, the bankruptcy court wrongly believed the Sallees' naive trust in bank officers, standing alone, created a fiduciary relationship.

### C. Fraud Claims

Besides finding that Fort Knox Bank had broken a fiduciary duty to the Sallees, the bankruptcy court found that Fort Knox Bank and its employees defrauded the Sallees. The bankruptcy court found Fort Knox Bank defrauded the Sallees when it gave the Sallees the misleading pro-forma, site survey, and appraisals that Cooney and Logsdon knew, or should have known, were inflated. In addition, the bankruptcy court found Fort Knox Bank defrauded the Sallees by misrepresenting the nature of the security interest it was taking in Worth Sallee's ESOP stock. The bankruptcy court, however, found that Fort Knox Bank did not defraud the Sallees concerning the promises of future financing.

With its appeal, Fort Knox Bank says the fraud claim cannot stand because the Sallees do not show reasonable reliance without a fiduciary duty. In response, the Sallees

A. Certainly.

(Joint Appendix at 980).

debtors hope to pay the lowest possible interest rate and fee charges and give as little security as possible. Without a great deal more, a mere confidence that a bank will act fairly does not create a fiduciary relationship obligating the bank to act in the borrower's interest ahead of its own interest.

Fiduciary relationships arise when circumstances and the relationship of the parties show the parties understood and agree that confidence is reposed by one party and trust accepted by the other. Fiduciary relationships can be informal, but they must evidence circumstances showing both parties agreed that one party would be acting in the interest of the other.

We are unaware of any Kentucky case discussing whether a bank violates a fiduciary relationship when the bank refuses to extend additional credit to the customer. We find, however, that the Ohio Supreme Court's discussion of this issue in *Ed Schory & Sons, Inc. v. Society Nat'l Bank*, 75 Ohio St. 3d 441, 662 N.E.2d 1074 (1996), describes the general rule.

In *Schory*, a business alleged that a bank had breached a fiduciary relationship when the bank failed to offer additional loans to a long-time customer. The business customer alleged that he had relied upon the bank's representation that it would extend financing for additional phases of a construction project.

Although the bank had given the business customer advice and assistance in creating the construction development, the court found this insufficient to create a fiduciary relationship. *Schory*, 75 Ohio St. 3d at 443, 662 N.E.2d at 1082. In reaching its decision, the *Schory* court first looked at the extent of the creditor and debtor relationship:

> The term "fiduciary relationship" has been defined by this court as a relationship "in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust."

. . . .

"The relationship of debtor and creditor without more is not a fiduciary relationship. A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reposed."

75 Ohio St. 3d at 442, 662 N.E.2d at 1081 (quoting *Umbaugh Pole Bldg. Co. v. Scott*, 58 Ohio St. 2d 282, 286, 390 N.E.2d 320, 323 (1979)) (internal citations omitted).

The *Schory* court concluded that advice in a commercial context does not create a fiduciary relationship:

". . . But here the offering and giving of advice was insufficient to create a fiduciary relationship. While the advice was given in a congenial atmosphere and in a sincere effort to help the [plaintiffs] prosper, nevertheless, the advice was given by an institutional lender in a commercial context in which the parties dealt at arms length, each protecting his own interest."

. . . .

[A]dvice given by a creditor to a debtor in a commercial context in which the parties deal at arm's length, each protecting his or her respective interests, is insufficient to create a fiduciary relationship.

75 Ohio St. 3d at 443, 662 N.E.2d at 1082 (quoting *Umbaugh*, 58 Ohio St. 2d at 287, 390 N.E.2d at 323).

We find the Sallees fail to show they had a fiduciary relationship with Fort Knox Bank. They had no longstanding relationship with Fort Knox Bank. The Sallees only approached Fort Knox Bank at Fred W. Bramblett's suggestion when they tried to put together financing for the purchase of the convenience store. After obtaining the loan for the purchase of the convenience store, the Sallees quickly went to Hardin County Bank to obtain additional financing.

More important, the Sallees understood Fort Knox Bank's interest was aligned with that of the Brambletts' and

obviously at odds with the Sallees' interest. The Sallees knew Fort Knox Bank controlled the sale of the laundromat because the Brambletts had unpaid loans secured by the laundromat.[12] The bankruptcy court found that Cooney told Sallee paying off Fort Knox Bank's debt was Fred W. Bramblett's primary concern.[13] The Sallees knew the bank was substituting the Sallees' obligation, secured by collateral, for the bad debt of the Brambletts. In such circumstances, no reasonable person could believe Fort Knox Bank aligned its interest with the Sallees to the extent it would put the Sallees interest ahead of its own.

Also, the Sallees themselves describe having only a generalized trust in Fort Knox Bank. Worth Sallee had trust and confidence in everyone he first met.[14] For example, Worth Sallee had the same level of trust, confidence and reliance in the President of the Hardin County Bank as he had in Logsdon.[15]

_____

[12]The bankruptcy court found that "[d]uring these meetings [Assistant Loan Officer] Cooney informed Sallee that the bank was eager to get Fred Bramblett out of the Laundromat, and that Sallee could purchase the Laundromat from Fred Bramblett at a good price and that Fort Knox Bank would fully finance the transaction." (Bankruptcy Court Judgment at 22).

[13]In addition, Worth Sallee testified that "Vicki [Cooney] told me she controlled Freddie Bramblett. He was going to do whatever she told him to do." (Joint Appendix at 998).

[14]Worth Sallee testified, "I trust everybody when I first meet them," (Joint Appendix at 993), and "I have a lot of trust and confidence in most people I meet," (Joint Appendix at 1011).

[15]Worth Sallee testified:

Q. Now, you've told us, sir, that you trusted and relied on Mr. Logsdon and believed what he told you in June, July and August of 1988, although it was your first business contact with Mr. Logsdon. Did you have that same trust and reliance on Mr. Bateman [of Hardin County Bank] at the time you dealt with him in October of 1988?